CEREALINE MFG. CO. v. BATES et al.

(Circuit Court of Appeals, Seventh Circuit. April 16, 1900.)

No. 391.

1. PATENTS—CONSTRUCTION—PROCESS PATENTS.

The statement of a process by a patentee, to be sustainable, must not only clearly distinguish the old from the new, so that the novelty claimed is obvious, but must point out the new steps so definitely that one wishing to use that process for the production of the desired product will have a clear chart before his eye.

2. SAME—FOOD PRODUCTS.

The Gent product and process patent, No. 223,847, for improved alimentary products from corn, is void for lack of novelty and invention.

Appeal from the Circuit Court of the United States for the District of Indiana.

The bill filed in the Circuit Court for the District of Indiana was to restrain the appellees from infringing Letters Patent No. 223,847, issued January 27,

1880, to Joseph F. Gent, for Prepared Cereals; the application being filed September 1, 1879. The appellant is the assignee of Joseph F. Gent.

On the hearing in the Circuit Court the bill was dismissed for want of equity, and thereupon the case was brought on appeal to this court.

The patent as issued is as follows:

"Be it known that I, Joseph F. Gent, of Columbus, in the County of Bartholomew and State of Indiana, have invented certain new and useful Improved Alimentary Products from corn. * * *

"The object of my invention is to obtain from the cereal known by the several names of 'corn,' 'Indian corn,' 'maize,' a new alimentary product, and to manufacture this new product in such a manner that it shall possess the quality of keeping in any climate.

"To these ends the first part of my invention consists of the new product composed of dry flakes made from clipped and purified kernels of corn.

"The second part of my invention consists of a compound process, the first step of which consists of the separation of the hulls and impurities from the kernels of corn by subjecting the corn to a dry clipping and cracking operation, and by separating the hulls and impurities from the heavier coarser portions by sifting and winnowing, or either of these operations, to obtain a purified granular product.

"The second step of the process consists in the steaming of the granular product for the purposes of softening and toughening the granules [without cooking the same].

"The third step of the process consists of warm-rolling the soft and tough and wet granules for the purposes of rolling or pressing the granules into flakes and of drying and hardening the particles.

"In order that my invention may be clearly understood, I will proceed to describe the process which I have successfully practiced for the production of the new product from corn.

"The winnowed kernels of corn may be passed through a suitable mill to crack and hull them, and the cracked grits sifted or bolted to separate the hulls as effectually as practicable; or such kernels of corn may be passed through a cracking, hulling and separating mill of any known kind, to hull, clip, and crack the kernels, as well as to separate the hulls and clipped portions from the granular cracked portions, at one operation.

"The purified granular material is then subjected to a steaming action in any suitable vessel, the steaming being continued long enough to effect a softening and toughening of the granules.

"The damp material (which may first be drained and otherwise treated to free it from the greater part of the condensed water) is then pressed and dried, so that the particles shall assume the form and quality of dry hard flakes. This drying and pressing I have effected successfully by passing the damp material through between warm rollers; [but many other means for accomplishing this step of my compound process will readily suggest themselves to any one skilled in the art].

"I am aware that corn has heretofore been hulled and granulated and steamed, and therefore claim neither of those processes; nor do I claim, broadly, a process consisting of the hulling and granulating and subsequent steaming of corn. I claim this compound process only when combined with the step of pressing and drying, as hereinbefore set forth, by which step my process is distinguished from any heretofore known process for the treatment of corn, and the consequence of the practicing of which step in my new process is the production of the new article herein described.

"What I claim as my invention, and desire to secure by Letters Patent, is:

"1. As a new article of manufacture, the herein-described alimentary product from corn, which consists of hulled, dry, hard, uncooked flakes made from the kernels.

"2. The process substantially as herein set forth, of making dry hard flakes from hulled kernels of corn for the production of a new alimentary product, which process consists of the following steps, viz.: first, crushing the corn in the dry state and separating the hulls therefrom; second, steaming the granular material to soften and toughen the particles [without cooking the same]; third, pressing and drying the particles to reduce them to dry hard flakes."

In the original specification the words "without cooking the same," now appearing in the patent (being printed in brackets in the foregoing), were omitted; also the sentence, "but many other means for accomplishing this step of my compound process will readily suggest themselves to any one skilled in the art."

There was also inserted in the application, on suggestion of the Patent Office, the paragraph, now immediately appearing before the preamble, as follows: "I am aware that corn has heretofore been hulled and granulated and steamed, and therefore claim neither of those processes; nor do I claim, broadly, a process consisting of the hulling and granulating and subsequent steaming of corn. I claim this compound process only when combined with the step of pressing and drying, as hereinbefore set forth, by which step my process is distinguished from any heretofore known process for the treatment of corn, and the consequence of the practicing of which step in my new process is the production of the new article herein described."

This amendment was made after the rejection of the original application, on account of the process and product lacking novelty in view of American patent, No. 136,305, dated February 25, 1873, to Lewis S. Chichester, and No. 174,346, dated March 7, 1876, to Henry H. Beach. The last paragraph referred to above was inserted because the original application failed to set forth, as per rule (14,) a statement of what is old, and the new thing to be distinguished therefrom, and the object to be accomplished by the improvement set forth; attention by the examiner having been called to the fact that the steaming and rolling of cereals was old; that the grinding, cooking, hulling, and steaming was old; that the hulling, crushing, cooking and dessicating was old; and that crushing and flattening, in connection with softening by cooking, was old.

Letters Patent No. 215,313, issued May 13, 1879, to Henry H. Beach for improvement in preparation of peas contains the following paragraph: "My invention has for its object to obtain pease in a condition in which they will be better fitted for the after processes to which they may be subjected with a view to their preparation as food or drink.

"To accomplish the object I have in view I cook them by moist heat in the manner indicated in my Letters Patent No. 172,863, dated February 1, 1876—that is to say, I submit them to the action of hot vapor in a suitable vessel or vat until they are properly cooked. Inasmuch as this step is fully described in my Letters Patent above named, it need not be further described here. Instead, however, of then subjecting the pease to a crushing, disintegrating, or grinding operation, which was the operation to which I subjected grain under said Letters Patent, I take the pease while they are still moist and pass them between heavy compressing-rollers, where they are flattened, though preserving their individuality, without being broken up or comminuted, but having their shape changed from the globular to that of a flat disk."

Canadian Patent, No. 9341, issued to Peter Haulenbeck, contains the following clause: "The peas or beans are removed from this vessel after about twenty minutes cooking, and subjected to pressure by suitable means. I prefer to pass them between plain rollers placed at about an eighth of an inch apart, these flatten the peas or beans without crushing or grinding them; they are allowed to dry and are in a hard and uniform condition that renders them better adapted to withstand atmospheric influences than when simply cooked or in a crushed, ground, or disintegrated condition."

Many other patents were in evidence, the purpose of which was to treat grain, by hulling, granulating, and steaming it, to some extent as is claimed in appellant's patent.

Relative to the introduction into this country of roller mills, the following stipulation was entered into: "Defendants proposing to introduce further evidence to show the extensive introduction of roller mills in this country as a substitute for millstones during the years 1876, 1877, and the years immediately following, it is stipulated that it may be taken as admitted herein that three competent witnesses called by the defendants, having personal knowledge thereof, would have testified that roller mills composed of pairs of smooth rolls, driven at uniform speed, held in close contact with each other and crush-

ing wheat or middlings between their opposing surfaces, were put into practical, commercial, public use in various flour mills in this country as early as 1876, and more extensively in 1877 and 1878, and that such roller mills, together with others driven at differential speed and in some instances having corrugated surfaces, have, since 1878, generally superseded millstones in cereal milling where carried on upon an extensive scale; that their use in 1876 and 1877 was largely for the purpose of crushing middlings; that the smooth roller mills thus used have from 1876 to the present date been generally operated at sufficient speed to heat their surfaces so that they would feel hot to the hand, and that they have throughout this period been usually so adjustable as to vary the degree of pressure of one roll upon the other, or the closeness of adjustment or grinding distance, at the will of the operator; this stipulation to have the same effect as if these facts were proved by competent witnesses actually called and sworn."

In the "American Miller," published at Chicago, September 18, 1876, occur the following sentences: "The great advantage the rollers have over the stones for the reduction of semolina and middlings lies in the squeezing action of the former against the tearing action of the latter, and therefrom it results that semolina, middlings and sharps, not entirely purified, will give a far superior flour when ground through rollers, because the small branny particles mixed into them are only flattened, and not ground to powder, which would decidedly occur when ground by stones. But the advantages of the rollers are still greater—their squeezing action gives a perfectly cool meal, and the flour gained by it is stronger, as the baker testifies."

It appeared in evidence that, prior to the Gent application for a patent, crushed wheat was manufactured in the Atlantic Flour Mills of Brooklyn after something like the following method: The wheat having been scoured, so that the woody hull was removed, was moistened, either by the introduction of a fine jet of steam, or by water turned from a tank upon a stream of wheat moving through a conveyer, and thereupon the softened berries were passed through two rollers, coming out crushed and flattened, but each berry maintaining its individuality, being in its pressed state about as large as a finger nail, and perhaps a little thicker. The product thus manufactured was called "Crushed White Wheat," and was sold in quantities as large as seven thousand boxes per month. A pamphlet advertising this product contained the following: "CRUSHED WHITE WHEAT, the most perfect preparation of entire wheat product that has yet been produced. By our process the grain is *thoroughly softened in every part.* The *hard crust* containing the *gluten* or *nitrogenous elements* is put into proper condition to cook *quickly* and *uniformly* with the soft and crumbly portion of the center, being the *carbonaceous* portion. The wheat that we use is of the choicest raised in the best wheat-growing section of the United States. It is first thoroughly cleaned and purified from all extraneous admixture, by the most complete, and severe mechanical contrivances, and prepared in such a manner that *all the elements of the grain are preserved.* The iron or silex are preserved in the outer or true bran; in this portion of the berry also lies the greatest amount of waste, which is a natural stimulant, and greatly assists nature in keeping the bowels and digestive organs in proper and healthful action. Our Crushed White Wheat will be found particularly desirable during warm weather, and in warm climates, being the most nourishing and the least heating of any other single article of food."

It was found that in the process of rolling the wheat the rollers would become warm, even to the degree of becoming overheated, and overheating was, of course, guarded against; but a proper degree of warmth was looked upon as beneficial, as it assisted in preserving the integrity of each berry.

It appears in evidence, also, that hulled rolled wheat was manufactured at the Golden Gate Mills of San Francisco prior to 1879. Josiah H. Locke, who had charge of the Golden Gate Mills for twenty-seven years, testified, in substance, respecting these operations as follows: After the wheat had been hulled and steamed, it was passed through porcelain rolls, set so close together that a sheet of paper would scarcely pass through; the berries thus pressed came out in flakes about as big as a thumb nail, or a five cent piece, or smaller, according to the size of the grain; the purpose was to roll

them, so they would not fall apart, but would retain a soft flaky shape; the porcelain rolls had come from Hungary; the rolled wheat thus produced was put up in five pound packages, and sold upon the market.

It appears that these rolls were introduced into the Golden Gate Mills about the time roller milling in general was being adopted by the millers of this country.

It also appears in evidence that prior to complainant's application the Empire Mills of Akron, Ohio, manufactured crushed barley, the process being substantially as follows: The hull and bran were first removed by a pearling machine. It then went to a cleaning machine; then to a heating machine, and then to the rolls. These rolls were of iron and steel with smooth surfaces driven at the same speed, and, moving in the same direction at the point of contact, were set about as far apart as the thickness of blotting paper. The barley was hot and moist when it went between the rolls, coming out in a flattened shape, and hanging together.

Certain exhibits were introduced in evidence which were said to be fair samples of the barley flakes produced by this process. These exhibits show a thin hard flake somewhat broken. The witnesses testified that the rolls used in this process became hot when in operation, and that a heat of about one hundred and fifty degrees Fahrenheit was considered the most advantageous one for the work in hand. Large quantities of this crushed barley were sold upon the market.

Other instances of the manufacture of wheat and oats by being moistened and steamed and then run through rollers, producing a flaky product, appear in the record.

In the brief of counsel referring to the crushed products of the prior art it is stated: "The art of making crushed wheat, and probably crushed oats and crushed barley, it is shown, has been practiced for a great number of years. Usually there has been no decortication, but there is proof in the case that pearled barley, by which is meant barley which has been decorticated, has been flattened by means of rolls.

"The treatment of the pearled barley is more nearly analogous to the process of the patent in suit than the customary treatment of wheat, oats and barley from which the husk or cuticle was not removed. If the process availed of in connection with the pearled barley is not an anticipation of the patent in suit, all the other processes of treating 'crushed' cereals are manifestly immaterial.

"The process availed of in connection with the pearled barley consists of three steps: (1) the separation of hulls and impurities from the kernels to obtain a purified granular product, (2) the heating of the purified berries by means of dry heat and (3) flattening the berries by means of rollers.

"That this process resembles the process of the patent is obvious. But there is as little doubt that it is essentially and distinctly different from the process of the patent in particulars which may be readily explained. * * *

"The crushed barley process contemplates the treatment of the whole berry. The purpose is not to rearrange the particles of starch so as to expose them. The process in all its parts contemplates the preservation of the individuality of each berry or kernel.

"The first step of the process of the patent involves 'Subjecting the corn to a dry clipping and cracking operation' (417,418). In the making of 'crushed cereals' the preservation of the individuality of the berry or kernel precludes the possibility of the production of the flake of the patent. The particles of starch can only be rearranged by lamination to form a flake by breaking the berry into a number of pieces. The crushed barley process, therefore, imposes at the outset conditions which prevent the formation of the flake.

"The second step in the crushed barley process consists in heating the berries. * * * During the whole period of the art the evidence is that the heat was invariably dry, the 'heaters' being always so constructed as to prevent the possibility of the steam coming in contact with the berry. * * *

"The third step of the crushed barley process was the rolling of the hot berries to give them a flattened shape. The evidence is that the rolls were usually heated, but the berry was not flattened and could not be flattened, by reason of its size, to form the flake of the patent in suit.

"The result of the process was a product differing both chemically and mechanically from that of the patent in suit and intended for and adapted to distinctly different uses."

Expert Brevoort, called for the appellant, compressed the purposes of the patent under discussion into the following statement:

"I understand from the patent that the first step of the process, which is to result in the production of dry, hard flakes, consists in the separation of the hulls and impurities from the kernels of corn by subjecting the corn to a dry clipping and cracking operation, and by separating the hulls and impurities from the heavier, coarser portions by sifting and winnowing, or either of these operations, for the purpose of obtaining a purified granular product. In other words, I understand that the first step of the process consists in the production of 'corn grits.'

"The second step of the process consists of steaming the granular product thus produced, for the purpose of both softening and at the same time toughening the grits or granules without cooking the same, that is, without, as I understand it, breaking up or disintegrating the individual starch cells, which are a large portion of the product.

"The third step of the process consists of warm-rolling the soft, tough and wet granules for the purpose of rolling or pressing the granules into flakes, and of drying and hardening the particles. The specification proceeds, after stating these steps, to describe at greater length the three steps first set forth as constituting the process of the second claim.

"I understand from the description that the granular product, after it is cracked and purified, is to be subjected to a steaming operation, which is only to be continued long enough to effect a softening and toughening of the granules, and that the softened and toughened granules are then to be passed, after being freed from any water of condensation, through warm rollers which will press the softened material into the form of flakes, and from which rollers these flakes will be delivered as hard, dry flakes.

"As to the drying, I understand that the flakes are to be delivered from the roll in such a condition of dryness that they may be handled without injury to their condition as flakes—that is, they are to be delivered from the rolls in a dry condition, as distinguished from a wet condition; and I also understand that the drying operation, which is conducted by the rolls, is not to be one which cooks the product in the sense that it completely or materially breaks up the starch granules of which the material is so largely composed."

The chemical ingredient of the product and process claimed is set forth in this paragraph from the brief of appellant's counsel: "Just what takes place when the process of the patent is practiced is obviously immaterial as affecting the claim for the result. We know to a certainty that this product which is the subject of the first claim is UNIQUE BY REASON OF THE FACT THAT IT IS A DEXTRINE PRODUCT, and we are equally certain that to do the things pointed out in the specification is to produce the product."

On the question of infringement of the process claim the testimony for the appellees may in substance be stated in the language of the opinion of the Circuit Court: "The defendants sprinkle their granules of corn with water at the temperature of from 80° to 120° Fahrenheit, and carry them through a system of conveyers to a bin, from which in about three hours they are elevated and passed between rolls having only such heat as is produced by the friction of the rolls." 77 Fed. 975.

There was much contradiction of this testimony offered by the appellant, so that counsel for the appellant are justified in saying: "The evidence concerning the infringement of the process claimed is voluminous and contradictory; either complainant's witnesses or defendant's witnesses were guilty of perjury."

The product produced by the appellees, as shown by the exhibits, is much the same as the products produced by the appellant, as shown in its exhibits. It is argued by counsel for the appellant from this fact (1) that the appellees made use of the same moisture, heat, and pressure that the patent describes; and (2) that the product of appellees contains soluble starch and dextrine, and is necessarily an infringement of the first claim of the Gent patent.

Rowland Cox, for appellant.

R. H. Parkinson and Charles Martindale, for appellees.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

GROSSCUP, Circuit Judge, after the foregoing statement of the facts, delivered the opinion of the court.

The most that can be said for the first claim of the Gent patent is that the hard, dry flake containing soluble starch and dextrine is a new article of manufacture or commerce. Before determining whether, as such, it is patentable, it is well to look into the second, or process claim of the Gent patent, and determine in what respects the process is new, and whether, as a process, it is patentable.

It is not our purpose to review, *in extenso*, the previous art; it is sufficient to point out in what respects the Gent process has been anticipated in the prior art. It is shown beyond question that a process that clips and hulls cereals, such as barley, wheat and oats, and then compresses the purified residue through rollers warmed by friction, so that there issues a perfectly cool meal, not ground to powder, but flattened, was used in roller mills previous to the Gent patent. The difference between this process and the process described in the Gent patent is two-fold: First, in the prior art the clipped and hulled cereals were barley and wheat; in the Gent process it is corn; and secondly, in the prior art, the cereal, after clipping and hulling, had not been moistened by steam before going through the rollers, so as to hold the particles together after passage through the rollers—a distinguishing feature of the Gent process.

It is also undeniable that prior to the Gent patent there were, in the special manufacture of cereal food products, a moistening and steaming prior to the passing of the crushed cereal through rollers. The cereals used in these manufactures were wheat, barley and oats, which, having been hulled so that the outer or woody shell was removed, and then moistened and steamed and thus softened, were passed through warm compressing rollers. The result of this process was a flake, preserving in its integrity the berry of the grain. Had the berry been previously clipped, the inner coating, as such, would have disappeared, and the kernel, properly moistened and toughened, would have doubtless taken on the form of a hard, dry flake. The difference between this product and the Gent product resides in the fact that in this product the integrity of the berry is, for the reasons named, preserved, while in the Gent product it is not; the cause of this difference being found in the clipping of the Gent process, whereby the inner sheath is broken up.

In the general manufacture of wheat flour prior to the Gent patent, the rollers were heated by friction. It is manifest that if the manufacturers of flour had clipped the berries of corn as they did the berries of wheat, and before passing the grits thus resulting through the rollers, had subjected them to a sufficient degree of steaming and moistening, the flour would have issued from the rollers (the rollers being sufficiently warmed) in the form of hard, dry flakes. The essen-

tial difference, therefore, between such general flour manufacture and the Gent patent is, that Gent, to some degree of heat, steamed and moistened the grits, and to some degree of heat, also, warmed the rollers,—a feature of manufacture not specially looked after by the general flour manufacturers.

It is also manifest that if the special manufacturers of food products from wheat, oats and barley, prior to the Gent patent had clipped the berries of the cereal, the product issuing from the warm rollers would have been a hard, dry flake, such as the Gent product. Whatever advance, therefore, Gent made over these special manufactures resides in the fact that the cereal hulled—an old step—, and softened and toughened—an old step—, has, before compression by the rollers, been likewise clipped—a step also old in general flour manufacture. At most, therefore, all that Gent has done to modify the previous general process of flour manufacture was to introduce the moistening and toughening, and, to some degree, warm rolling; all he has done to modify the previous special processes of manufacturing cereal foods was to clip the berry—a step that had been used in the general manufacture of flour.

It is doubtful indeed if Gent is entitled to credit for these modifications; but for the purposes of this decision they may be conceded. Do any of these modifications make his process patentable? First, then, in respect to the clipping: In the first application to the Patent Office the first step of the process was described as consisting of the separation of the hulls and impurities from the kernels of corn, by subjecting the corn to a dry clipping and cracking operation; the second step as consisting in the steaming of the granular particles for the purposes of softening and toughening; and the third step as the warm rolling of these soft, tough, and wet granules for the purposes of pressing them into flakes. The application, thus stated, was rejected, for the reason that all these steps appeared in the former art; and in this rejection Gent acquiesced, by amending, so that the second step consisted of softening and toughening the granules *without cooking the same*. This is a concession that a process, otherwise like his, including the clipping and hulling, but in which the toughening is accompanied or brought about by cooking, would amount to no infringement upon his claim. In other words, the prior art is admitted by Gent to have included every step of his process, except as it is modified by the absence of cooking. There is, therefore, by his own concession, no novelty in the mere fact that the grain is clipped, though such process includes the softening and toughening necessary to produce a flake product.

Is there any moistening or steaming in the Gent process different from that in the manufacture of prior food products? If so, it is not pointed out in the description of the patent, unless the difference resides in an absence of cooking. But there is no serious claim anywhere in this case that the absence of cooking is a chemical or mechanical cause that brings about the hard, dry flake. It is conceded that the grit, either in the steaming or warm rolling, must be subjected to a heat in excess of one hundred and thirty-five degrees

Fahrenheit, in order to develop dextrine, and chemical authorities place the necessary heat at two hundred and eighty-four degrees Fahrenheit and upwards. It is nowhere claimed by appellant that a heat of less than two hundred and eighty-four degrees Fahrenheit will produce the dextrine found in the flakes. The appellant points to no place in the process where this heat is applied, and can, upon the state of the prior art, point to no step in the process distinctively different from the moistening and steaming, or the warm rolling that characterized the manufacture of previous cereal foods. Indeed, counsel for the appellant nowhere point out in the Gent process the efficient cause producing the hard, dry flake. They are contented with the insistence that because the hard, dry flake, in fact, contains soluble starch and dextrine, there is in hiding somewhere in the process the cause of such a result. We are asked to pronounce this process patentable, not because we can see wherein the novelty resides, or that the efficaciousness of the process is due to such novelty, but because the product is, in some respects, different from anything going before.

The statement of a process upon the part of a patentee, to be sustainable, must not only clearly distinguish the old from the new, so that the novelty claimed is obvious, but must point out the new steps so definitely, that one wishing to use that process for the production of the desired product, will have a clear chart before his eye. In this essential the Gent process utterly fails. An inspection of the description discloses its progressive steps—hulling and clipping; steaming and moistening; compression through warm rollers—but as we have shown, none of these are new. What degree of steaming or moistening is not made apparent; what should be the warmth of the rollers does not appear. The user would be obliged, with this chart before him, to experiment, just as Gent doubtless experimented, before he obtained a hard, dry flake. The patent would be no guide; it would not even facilitate the production of the hard, dry flake. It leaves the world, as would-be manufacturers, just where it found Gent—with valuable general information on the subject, but with no definite formula. As a process patent, therefore, the Gent claim fails.

Is the hard, dry flake a new article of manufacture within the meaning of the patent law? New articles of manufacture must not be confounded with a new article of commerce. The latter may be novel and highly useful, even to the displacement in commerce of its predecessors, but is not, on that account, patentable. Powdered sugar succeeded to loaf sugar; ground coffee to coffee in the berry, and as articles of commerce largely supplanted sugar and coffee in their previous forms, but no one claims that, within the meaning of the patent law, such change, though new and useful, constituted a new article of manufacture.

Steel, on the other hand, when first made, as the result of the combination of carbon and iron, was an essentially new manufacture. It introduced a practically new metal into the uses of mankind. It differed so essentially from its ingredients in their former state,

that the change was not a mere modification, but was a creation. No one would classify steel with iron; it is a distinct species.

Is this true of the hard, dry flake of the Gent patent? The whole emphasis of appellant's contention is placed upon the fact that, unlike flour, the flake is not laminated, but through the presence of soluble starch and dextrine the granules cohere, and a flake results. The development of dextrine is urged as the efficacious novelty giving to this product its merit. But dextrine is inherent in every cereal containing starch which has been subjected to a certain degree of heating. It is found in breads that have been twice baked in a high degree of heat; it is the well known result of heat applied to soluble starch; it is doubtless present in the wheat and barley flake of previous cereal foods.

The Gent product may be brighter in color, more desirable in commerce, and more useful, than its predecessors, but is composed of no ingredients previously unknown, and is the result of no essentially new combination of old ingredients; nor is it, so far as we can see, the result of any new mechanical or chemical process. At most, it is an advance only upon the old art in the direction of perfection—a step merely in the mechanical evolution of cereal foods and general flour making.

There is no clear line of demarcation between what may be called new articles of commerce, not patentable though useful, and new articles of manufacture patentable as such. Each instance brought to the attention of the court must be determined more or less upon the situation peculiar to itself. We think it sufficient to say that no result of a machine or process is patentable independently, where it is apparent that such result is a degree only in advance, in the evolution of an art that is as wide as is the manufacture of cereal foods and flour. The Gent patent is, in our judgment, in no just sense, a new product; but only a modification or advance upon products already as widely known as the civilized breakfast table. Patents can not rightly be made to cover every change in the betterment of material conditions. The growth of the art of cereal foods, unless something distinctively new *in specie* is contributed, is the growth of common public thought, and, therefore, independently of the process (which may be protected) belongs to the public.

But, while this hard, dry flake is doubtless the output of appellant's mills, we are not at all satisfied that it is the result of the Gent process. It is manifest that starch will not be quickly converted into dextrine, except under a temperature of from two hundred and eighty-four degrees to three hundred and twenty degrees Fahrenheit. In what part of the patent is this provided? Not in the warm rolling, for no degree of temperature is there mentioned; not in the steaming and moistening, for that expressly must not proceed as far as cooking. We can put our finger on nothing in the patent directions that is responsible for the evolution of dextrine. Dextrine is doubtless present in the flake, but has it not been developed by cooking? If so, the process actually employed is different from the process pointed out in the patent; so different, that, as described in

the first Gent application, it was rejected, on account of the prior art. We are not satisfied that the appellant, in practice, is not following the directions of the first Gent application, while in theory, for the purposes of these suits, relies upon the amendment. This doubt exempts the defendant, both in the process employed, and the result produced, from a judgment of infringement.

The decree of the Circuit Court will be affirmed.