SANITAS NUT FOOD CO., Limited, v. VOIGT et al.

(Circuit Court of Appeals, Sixth Circuit. June 8, 1905.)

No. 1,388.

1. PATENTS—NOVELTY—CHANGE IN FORM OF COOKED GRAIN.

Whatever novelty, in a patentable sense, there may be in flakes of cooked wheat, must be found in some superior efficaciousness or some new properties which they possess, and not in any mere change of form produced by mechanical division of the cooked grain either before or after the last step in cooking. Nor does the fact that such flakes contain some dextrin make them a new product in a patentable sense, that being true to a greater or less extent of other forms of cooked wheat.

2. SAME—COOKED WHEAT PRODUCTS—GRANOSE FLAKES.

The Kellogg patent, No. 558,393, claim 2, for an improved cooked alimentary product from grain, such as wheat, in the form of "large, attenuated, baked, crisp, and slightly brown flakes of practically uniform thickness, the same being readily soluble, and containing dextrin," is void for lack of patentable invention, it appearing that such product does not differ in its properties or food value from other forms of cooked wheat previously known, except perhaps slightly in degree.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

This is a bill to enjoin infringement of patent No. 558,393, issued to John Henry Kellogg, of Battle Creek, Mich., for "a certain new and useful alimentary product and process of making the same." This patent was assigned to the complainant, a partnership association under the laws of Michigan, doing business as the Sanitas Nut Food Company, of which the patentee and W. K. Kellogg and W. C. Kellogg are the sole members. The claims of the patent are two in number, one for a process and one for the product. They are as follows:

"(1) The process hereinbefore described for the manufacture of an improved alimentary product, which consists, first, in soaking the grain in water for

some hours, whereby it is subjected to a preliminary digestion with its contained cerealin, and at temperature which prevents actual fermentation; second, subjecting the previously soaked grain to heat for a time sufficient to completely cook the starch; third, drying the grain; fourth, rolling the grain between cold rollers; and, fifth, baking the flakes until thoroughly dry and crisp, as specified.

"(2) The improved cooked alimentary product from grain such as wheat, hereinbefore described, which exists in the form of large, attenuated, baked, crisp, and slightly brown flakes of practically uniform thickness, the same being readily soluble, and containing dextrin, as specified."

The bill charged infringement of both claims, but upon the hearing the process claim was abandoned. The defense was nonpatentability and non-infringement. Upon a final hearing District Judge Wanty held the claim for the product to be void for want of novelty.

Fred L. Chappell (Otis A. Earl and Wylie C. Margeson, of counsel), for appellant.

Albert Crane and Mark Norris, for appellees.

Before LURTON and SEVERNS, Circuit Judges, and EVANS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

That the defendants produce a product substantially identical with that of the patent may for the purposes of the case be conceded. That they do this without following all of the steps of the process described in the Kellogg specifications is conceded. Thus they do not subject the grain to the preliminary soaking in water which is the first step of the patent, a step by which Kellogg claims to secure "a preliminary digestion by aid of cerealin, a starch digesting organic ferment contained in the hull of the grain or just beneath it." "This digestion," says the patent, "adds to the sweetness and flavor of the product." Neither do the defendants subject their flakes of grain just before baking or roasting them "to the steaming process" of the specifications. It would seem to follow, if the product of the defendants is substantially that of the patent, that the patentee included steps in his method of making his product which were immaterial to the production of his product and misleading. But the contention is that the second claim of the patent covers the product there described and claimed by whatever process it is produced, and that the specifications point out a process by which the product may be produced if followed. That there may coexist both a patentable process and product is plain. In such case both the process and the product must be new and useful. So it may be conceded that a process may be old, but the product new, or the product old and the process new. In such case the one will be patentable and the other not. In Providence Rubber Co. v. Goodyear, 9 Wall. 788, 796, 19 L. Ed. 566, it was said:

"The patentability, or the issuing of a patent as to one, in no wise affects the rights of the inventor or discoverer in respect to the other. They are wholly disconnected and independent facts."

Nevertheless it does not follow that a single patent may issue for both a process and a product when the latter is wholly independent

of the other. The Goodyear patent, referred to above, originally issued for both a process and a manufacture. It was surrendered, and two patents taken, one for the process and one for the product. The process patent was held void, as being too broad. The product patent was held valid, and what was said upon the independent character of process and product patents was said in the appeal, which involved the validity of the separate product patent.

But we shall waive the question of the effect of including in one patent two claims, one for a process and the other for a product independent of the process, however produced. We shall assume for the purposes of this case that the product claim is for the product independent of the process, although there is much in the patent tending to limit the product claim to the product of the process of the patent. Counsel for the patent having staked the whole case upon a broader interpretation, we shall pass by either of the troubles in appellant's path mentioned above, and examine the claim as one for an article of manufacture, independent of the process of its making, treating the specifications as an effort to point out the best method of manufacture known to the inventor. Thus considered, the claim is for cooked flakes of grain, usually wheat, as a patentable article of manufacture. The complainants make and sell this article under allied names, such as "Granose Flakes," "Toasted Wheat Flakes," and as "Granose Biscuit," the latter being flakes assembled in a biscuit form. After all has been conceded that can be reasonably claimed in favor of the nourishing quality of grain when prepared according to the patent, it is at last an article which pertains to the cooking art; an art, if it may properly be called an art, which is as old as the discovery of the uses of fire, and as varied in its exemplifications as the sands of the sea. Whatever novelty in a patentable sense there may be in flakes of cooked wheat which are thin, crisp, and slightly brown, must be found in some superior efficaciousness, or some new properties which they possess, and not in any mere change of form produced by mechanical division of the cooked grain either before or after the last step in cooking. In Glue Co. v. Upton, 97 U. S. 3, 6, 24 L. Ed. 985, this point is very clearly stated, where the patentability of a readily soluble form of glue, resulting from a mechanical subdivision of the old commercial form of the article, was under consideration. "The whole claim," said the court, "is to an old article of commerce in a state of mechanical division greater than previously used, but unchanged in composition and properties, and the benefits arising from the increased division are such as appertain to every soluble substance when divided into minute particles. * * * A distinction must be observed between a new article of commerce and a new article which, as such, is patentable. Any change in form from a previous condition may render the article new in commerce, as powdered sugar is a different article in commerce from loaf sugar, and ground coffee is a different article in commerce from coffee in the berry. But to render the article new in the sense of the patent law, it must be more or less efficacious, or possess new properties by a

combination with other ingredients; not from a mere change of form produced by a mechanical division." See, also, Cerealine Mfg. Go. v. Bates, 101 Fed. 272, 280, 41 C. C. A. 341, and Maryland Hominy Co. v. Dorr (C. C.) 46 Fed. 773. Even the form in which the Kellogg grain is offered is not new. The flaking of grain, cooked and uncooked, was a well-known method of preparing grain for consumption. See, among the many patents in this record, those to Gilman & Spencer for a process of preparing flaked cereals ·issued in 1885, and the British patent to Perry for cooked filaments of rice. There is no patentable difference between cooked shreds of grain and cooked flakes. The patent to Perky and Ford of 1893 was for a machine for the preparation of cereals for food. The prepared grain according to that patent was compressed between rollers into "threads, lace, or ribbons or sheets," the form depending upon the proximity of the rollers to one another. But Kellogg's claim covers cooked grain when specialized by the application of many adjectives, and, if it is to be sustained at all, these adjectives must be given emphasis. Thus his product is for flakes, not meal nor shreds, nor any other form or subdivision of grains. They must be "large," "attenuated," "baked," "crisp," "slightly brown," and "of practically uniform thickness." Cooked grain thus prepared, and having all of the characteristics called for by the claim, may constitute a new article of commerce. But do they render the article new in a patentable sense? If so, it must be due to some new properties, or improved efficacy as a food. The object of the inventor, as stated in his specifications, "is to provide a food product which is in proper condition to be readily digested without any preliminary cooking or heating operations, and which is highly nutritive, and of an agreeable taste; thus affording a food product particularly well adapted for sick and convalescent persons." These results, he claims, are due to his process or method of preparing the article. Thus his first step is to soak the grain "for some hours, say. eight to twelve, in water at a temperature which is either between 40 degrees and 60 degrees Fahrenheit, or 110 and 140 degrees Fahrenheit, thus securing a preliminary digestion by aid of cerealin, a starch-digesting organic ferment contained in the hull of the grain, or just beneath it." The results he claims from this long preliminary soaking are that this preliminary "cerealin digestion" converts a part of the starch into dextrin, and "add to the sweetness and flavor of the product." The defendant does not put his grain through the long preliminary soaking made a step in the process claim of the patent. Nevertheless, defendant's flakes are claimed to infringe, and the evidence establishes that in form, appearance, and chemical constituents the flakes produced without the "cerealin digestion" resulting from the preliminary soaking of the patent are in all material matters identical with the product made according to the process of the patent, and with the Granose Flakes made and sold by complainant. The explanation is doubtless due to the fact that this "cerealin digestion" only results in the conversion of a small proportion of the starch into dextrin, a

result likewise reached by the boiling and baking to which the defendants subject their grain.

But the patentee also claims as a result of grain prepared as he directs a degree of solubility "readily distinguishable from ordinary preparations of wheat or allied grains," and in his product claim he claims the article to be "readily soluble, and containing dextrin." To be digestible, food must be soluble, otherwise it is not absorbed. All cooked grains are more or less soluble in the human stomach. It is not new, but old, that the digestibility of any cooked food depends in a large degree upon its proper cooking. Either underdone or overdone, and digestibility is affected. If bread or grain or any other starch-containing food be subjected to the right degree of temperature, a certain proportion of starch is converted into dextrin, and dextrin is a valuable digestive agent. Thus the well-done crust of bread is more soluble, and therefore more digestible, than the underdone and dough-like interior. If the crust be baked until it is brown, it is evidence that a portion of the starch has been converted into dextrin. These are matters of common knowledge. Kellogg claims a patentable article because his cooked flakes are large, thin, crisp, and slightly brown, "same being readily soluble, and containing dextrin." The claim does not state what per cent. of dextrin is necessary to constitute the patented article. As we are not concerned with the complainant's process as a process, and are dealing only with his claim for a patentable article of food, however produced, we are driven to assume that evidence of the presence of some dextrin is afforded whenever we find cooked flakes of grain which are crisp and slightly brown; the inference being that they have been subjected to the proper temperature to dextrinize some of the starch in the grain because they are crisp and slightly brown. It follows, then, that any per cent. of dextrin which may result when such flakes are subjected to cooking sufficient to make them crisp and brown will constitute an infringing article. But dextrin results in greater or less quantity whenever any starchy food is cooked enough to brown the exterior. Not that the browning is essential to the production of dextrin, for subjection to moist heat of from 280 degrees to 320 degrees Fahrenheit will convert some portion of the starch into dextrin; but the browning of the surface of any kind of bread is evidence of having been subjected to heat enough to convert the starch of the browned exterior into dextrin, and this, we take it, is the significance of the claim for "crisp," "slightly browned" flakes.

But the fact that cooked flakes of wheat contain some dextrin will not make a new article in a patentable sense. It is at most a new form of cooked wheat, and possibly a new article of commerce, by reason of some advantages it may possess over any earlier form, but, as no new product has resulted, it cannot be regarded as a new article in a patentable sense. The fact that Kellogg's flakes include the whole wheat, the bran covering being broken into small particles by the process of compression, does not distinguish his product from other and earlier methods of preparing grains for food. In-

deed, the shredded biscuit of Perky, covered by his patent of October 15, 1895, his application having been filed March 15, 1894, is a complete anticipation of the cooked flakes of Kellogg, except that the grain in Perky is in form of long, thin, crisp and slightly brown filaments or shreds instead of flakes. There may be some slight advantage in the flake over the shred as a form presenting more surface to the drying effect of heat, and making a food which may keep longer. So, too, the shred may not be so much dextrinized as the flake for the same reason. We do not say that this is so, for the weight of the scientific evidence in this transcript is that the Perky biscuit keeps thoroughly, and contains about the same per cent. of dextrin as the Kellogg Granose Biscuit, or his Granose Flakes. There is, indeed, very convincing evidence that the idea which resulted in complainant's cooked flakes was taken from Perky's shredded biscuit. Certain it is that in the winter of 1893–94, or early spring of 1894, Dr. Kellogg visited Denver, saw Perky, and closely inquired into his shredded biscuit. Perky's shredded biscuit at that time were being made and sold in great quantities at Denver. It may be that then they were not so perfectly dried as to keep well, and that Perky received some notion that a more thorough baking of his shreds would enable him to sell a biscuit which would keep long. Precisely the time when Perky found it desirable to more thoroughly bake his shredded biscuits as a means of preservation is not clear. But if it be admitted that in respect to keeping qualities the cooked flake was an improvement over the cooked shred, still it is only a question of degree, an improvement which did not require the exercise of invention. It is at most an improvement which any one acquainted with the industry would fall upon as an advantage, if it was desirable to add to the keeping qualities of the food.

The cooked flakes of the Kellogg patent are not, in our judgment, a new product. It is at most a step in advance upon products well-known in trade and to the breakfast table. The cases most nearly in point are hostile to the claim. Maryland Hominy Co. v. Dorr (C. C.) 46 Fed. 773; Cerealine Mfg. Co. v. Bates, 101 Fed. 272, 41 C. C. A. 341.

We find no error in the decree dismissing the bill, and it is therefore affirmed.