DUNN WIRE-CUT LUG BRICK CO. v. TORONTO FIRE CLAY CO. et al.

(Circuit Court of Appeals, Sixth Circuit. January 7, 1919. On Motion to Reopen, May 6, 1919.)

No. 3142.

1. PATENTS ☞36—PRESUMPTION OF INVENTIVE NOVELTY FROM USE—ATTRIBUTION TO PRODUCT.

Though brick of a certain type, which have gone on the market and had a large sale, are the product of the patentee's patented machine, which has been manufactured by him and sold to brickmakers, such credit and such presumption of inventive novelty as arise from public use should be given to the product, the bricks, and not to the machine.

2. PATENTS ☞328—VALIDITY—INVENTIVE CHARACTER—PAVING BRICKS.

Dunn's patent, No. 918,980, for wire-cut paving brick having wire-cut ribs on the side, held valid, because the concept had inventive character, as distinguished from mere skill.

3. PATENTS ☞8—NEW PRODUCT—VARIATIONS IN METHOD OF MAKING.

The inventor of a new and useful product or article of manufacture may have a patent covering it and giving a monopoly upon it, regardless of great variations in the method of making.

4. PATENTS ☞8—METHOD AND PRODUCT—SEPARATE PATENTS.

In the ordinary and typical case, the method of manufacture and the product manufactured are separable inventions supporting separate patents, one of which may be valid and the other not.

5. PATENTS ☞328—PRODUCT PATENT—INFRINGEMENT BY MANUFACTURING DEVICE.

Dunn's patent, No. 918,980, for wire-cut paving brick having wire-cut ribs on the side, held infringed by the product of defendant's manufacturing device.

6. PATENTS ☞226—INFRINGEMENT—WHAT CONSTITUTES.

As between plaintiff's earlier and defendant's later patent, a finding that the earlier device, if later, would not have infringed the later patent, is not helpful in deciding whether defendant's device infringes plaintiff's patent.

On Motion to Reopen.

7. PATENTS ☞324(1)—LATE INTRODUCTION OF EVIDENCE—CONDITIONS OF PERMISSION.

In suit for infringement of patent, where, after direction of the usual interlocutory decree on finding of infringement, defendants present foreign patents said to anticipate plaintiff's product, and ask leave to apply to reopen the case and put them into the record, on account of the public interest and the interest of the courts, the proposed evidence will be permitted to be brought into the record on defendants' meeting additional expenses of another trial; their showing to excuse failure to put in the evidence in due time not being satisfactory.

Appeal from the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Suit in equity for infringement of patent by the Dunn Wire-Cut Lug Brick Company against the Toronto Fire Clay Company and

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

others. From decree dismissing the bill, plaintiff appeals. Order entered that the District Court have leave to reopen the case, etc.

J. C. Sturgeon, of Erie, Pa., and S. H. Tolles, of Cleveland, Ohio, for appellant.

David M. Gruber, of Steubenville, Ohio, and Joseph T. Harrison, of Cincinnati, Ohio, for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. The company which had purchased the patent appeals from the decree dismissing its infringement bill brought against the Toronto Company and Nicholson, and based upon patent No. 918,980, issued April 20, 1909, to Dunn, for paving brick. The trial court overruled the defense of invalidity, but held that there was no infringement, and both of these subjects must be determined.

Brick were originally made by molding or pressing in individual dies or forms. The product was a molded brick or a pressed brick. It was found to be cheaper to squeeze the plastic clay through a die shaped like a cross-section of the finished brick and producing a continuous blank from which pieces could be cut or sliced off to form separate bricks. Because it came to be the more common practice to slice off these bricks from the blank by using a moving wire as the cutting edge (either one wire at a time or several in a gang), bricks of this class came to have the name "wire-cut bricks." Whether the cutting was done by wire or a knife or a saw was not important, because these methods are, in any broad sense, obviously equivalent. A cutting wire works like the cutting edge of a knife, and the cutting edge of a knife, is, for this purpose, a wire; hence all such brick whether sliced by wire or knife or saw, are, in the trade, universally called "wire-cut brick."

For paving, it is desirable that the brick should not fit close together, but should be spaced slightly apart, in order that waterproofing and adhesive material may fill the interstices and make a perfect bond. Accordingly, they were made with buttons, ribs, or slight projections of other forms upon one or both of the vertical faces of the two adjacent bricks. These were formed by suitable depressions in the dies in which the pressing was done; and, up to Dunn's time, all paving brick with lugs or ribs had been repressed brick. Dunn observed, and seems to have been the first fully to understand, that, for the purpose of paving, the brick were injured by this repressing. The surface was too smooth, the corners were not sharp enough, and the texture or lamination was distorted; but the ordinary wire-cut brick were unsuitable for this purpose, because they had no spacing ribs. It seems fairly to be inferred that, if the idea of putting ribs on wire-cut brick had occurred to any one, it had been rejected because of the difficulties or expense involved. In ordinary hand operation, to get this result would necessarily be slow, and operating upon such material would be likely to break away parts of the brick or ribs and produce defective brick.

In this situation, it occurred to Dunn that, by the same operation by which he cut off the brick from the blank by sweeping the cutting wire across its face, he could leave ribs along the face, and he could accomplish this result by making the cutting edge irregular, instead of straight. In the form in which he developed his idea, he carried the wire on each side of his blank of clay in a slot which was straight most of the way, but included two semicircular offsets. The result was a brick, plane upon each side, excepting where crossed by two projecting ribs. He first applied for a patent upon the machine accomplishing these results, but, while that application was pending, filed also an application for a patent upon the product of his machine. This is the patent in suit. The patent upon the machine was not issued until September 7, 1909. The first claim of the patent in suit is:

"As an article of manufacture, a wire-cut brick having wire-cut ribs on the side thereof, substantially as set forth."

[1] Dunn's product has been very largely accepted as a better paving brick than before existed. Although the brick of this type which have gone on the market and had this large and wide sale are the product of his patented machine, which has been manufactured by him and sold to brickmakers, yet such credit and such presumption of inventive novelty as arise from public use should be given to the product, and not to the machine. There would be no use for the machine, unless the product were desired. We therefore give some weight to this wide public use as bearing on the patent's validity.

[2] We think Dunn's concept had inventive character as distinguished from mere skill. The fact that this very simple product, which proved to be so useful, never had been developed during all the progress of the art, goes far to give it character. Repressing, with its cost and disadvantages, was avoided and a better brick was produced by simple means. We agree with the District Judge in saying:

"His brick is new and useful, and involved invention in no mean degree, and entitles him to the breadth of equivalency pertaining to an invention of that character"

—and agree also with his summary quoted in the margin.[1]

Without regard to whether a patent upon a product may be wholly independent of any thought of the means by which it is produced, there

---

[1] Dunn conceived and produced a wire-cut brick with wholly wire-cut lugs, thereby dispensing entirely with the repressing process and with the expenditure necessary to effect the same. The development of his concept involved much study and experimentation. He was hampered not merely by want of funds, but by the distrust, discouraging conduct, and opposition of brickmakers and engineers. However, by persistent energy and determination he overcame the obstacles encountered and eventually won recognition by practically demonstrating the commercially successful character of his brick and the mode of its production. The roughness of the sides of the brick, which at first provoked opposition, was found in actual experience to be advantageous, as the filler was thereby enabled more firmly to set and more securely to hold than is possible with the smoother surfaced brick. The demand for his brick, following the test of actual service, was such that the output rose from 2,233,000 in 1910, to 138,000,000 in 1915. In the same period he granted 33 licenses to manufacturers.

can, in this case, be no such independence. Some degree of reference to the method of the production is carried into the claim by the words "wire-cut ribs." Where a process or a machine will produce only a specific product, and where a given product can be produced only by the specific process or machine (if there are such cases; see Macbeth Co. v. General Co. [C. C. A. 6], 246 Fed. 695, 698, 158 C. C. A. 651), it is difficult to see much lack of identity between the invented process or machine and the invented product, and such situations have given rise to some rather casual and seemingly obiter statements that process and product or machine and product constitute only one invention (e. g., Downes v. Teter-Heany [C. C. A. 3] 150 Fed. 122, 80 C. C. A. 76). It is thought that every such case will be found to depend upon this—actual or supposed—necessary identity of the means and the result.[2]

[3, 4] Certain it is, in view of the weight of authority and the latest decisions, that the inventor of a new and useful product or article of manufacture may have a patent which covers it and gives a monopoly upon it regardless of great variations in the method of making (Powder Co. v. Powder Wks., 98 U. S. 126, 136, 137, 25 L. Ed. 77; Leeds Co. v. Victor Co., 213 U. S. 301, 318, 29 Sup. Ct. 495, 53 L. Ed. 805; Durand v. Schulze [C. C. A. 3] 61 Fed. 819, 821, 10 C. C. A. 97; Maurer v. Dickerson [C. C. A. 3] 113 Fed. 870, 874, 51 C. C. A. 494; Lamb v. Lamb [C. C. A. 6] 120 Fed. 267, 269, 56 C. C. A. 547; Sanitas Co. v. Voigt [C. C. A. 6] 139 Fed. 551, 552, 553, 71 C. C. A. 535; Acme Co. v. Commercial Co. [C. C. A. 6] 192 Fed. 321, 325, 326, 112 C. C. A. 573), and that in the ordinary and typical case, the method and the product are separable inventions, supporting separate patents, one of which may be valid and the other not (Rubber Co. v. Goodyear, 76 U. S. [9 Wall.] 788, 19 L. Ed. 566). It is therefore the duty of the court to find, if it reasonably can, for a product patent some construction and scope which shall avoid, on the one hand, destroying its value—if not its validity—by confining it to the precise method of making which the patent has happened to show, and avoid, on the other hand, a construction so broad as to make it invalid because for an old product. As illustrated by the present case, if Dunn is confined to wire-cut brick with wire-cut lugs produced precisely as shown by him,

---

[2] We find no authoritative decision lending more color of support to the idea that a patent for a product is to be confined to the result of the described process, than may be derived from some of the language in Goodyear Co. v. Davis, 102 U. S. 222, 224 (26 L. Ed. 149). It was there said: "The invention is a product or manufacture made in a defined manner. It is not a product alone, separated from the process by which it is created." This conclusion was the result of an exhaustive study of the facts of the particular case, and was intended to refer to those facts. The claim was for "the plate of hard rubber or vulcanite, or its equivalent." The defendant did not use hard rubber or vulcanite, and the question was whether celluloid, an article unknown when the patent issued, was an equivalent. The case does not hold that if the defendant had employed a hard rubber plate he could have escaped because he manufactured this hard rubber by a process different from that described by Cummings. Nothing which was not made by the process of vulcanization could be the equivalent of the "hard rubber or vulcanite" of the claim. The process of vulcanization was imported into the claim by its very terms.

the patent is commercially worthless because easily avoided; while, if it is construed to cover a wire-cut brick which, before burning, has had irregularities produced upon its face by any cutting or carving means whatever, it would be void because of common practice relating to all kinds of tile, brick and pottery.

The theory that this patent extends only to the output of the method shown in the machine patent is inconsistent with the action of the Patent Office. Dunn first claimed "a wire-cut brick having wire-cut ribs on one side thereof formed complete during the operation of cutting the brick." This was rejected as "claiming the article by the method of making it." The Patent Office recognized and applied the rule above stated. Dunn then substituted the claim allowed and issued.

[5] The true scope of the claim can best be developed by tracing it from the form shown in the drawing to the form used by defendant. It is, doubtless, more economical to have the same stroke of the wire or cutter sever the brick from the blank and produce the ribs; but the claim cannot be so restricted without destroying the differentiation between the patent for the machine and the patent for the product. We think it clear that the patented product would be produced just the same if Dunn took a brick which had already been severed from the blank on both sides by some other wire-cutting machine, and passed that brick through his machine, using his wire-cutter to completely reshape one entire side of that brick. The brick would be wire-cut, and the ribs would be wire-cut, although one face of the brick would have been treated twice instead of once. This would not be an unnatural treatment, if it was desired to have the ribs upon any face excepting the one produced by the cutting wire. When we admit the equivalency between the cutting knife and the cutting wire, we see that this supposititious treatment is that which defendant Nicholson has adopted (and the Toronto Company uses). He first cuts his blank into separate brick by the usual wire-cutting process, then passes his severed brick along a feed table and over a cutter which he calls a knife, the form of which is shown by *29, 30* in the following figures 3 and 6 taken from the patent issued to him, No. 1,148,529 of August 3, 1915. This cutter or knife is the perfect equivalent for this purpose of a wire bent into the same form.

Defendant suggests no difference in operation excepting that he thinks such sharp corners could not be put on the ribs of a wire cutter; and this is immaterial. We must infer that this knife wholly reshapes that surface of the brick and transforms a plane surface into a surface with ribs. It seems improbable that the blank of plastic material can travel forward over this knife, with the uncut portions or ribs depending into the depressions *30* of the cutter and with the necessary

resulting distortion of the material, without filling these depressions and causing the entire ribs to be formed and shaped by the knife. If possibly this does not completely occur, yet it is certain that the sides of the ribs are thus formed and shaped, and that, at the most, only their extreme tops—a very small fraction of their whole surface—escapes this knife or wire-cutting origin, and these rib tops have already been "wire-cut." We are convinced that, in the true sense of the patent, in the sense necessary for its right construction, the ribs on defendants' brick are "wire-cut"; the extent to which they may fail to be so formed is comparatively negligible. Thus we see that the patent grant may fairly be construed to cover a method of production slightly variant from, but practically equivalent to, that described in the patent, and yet that its monopoly will leave untouched wire-cut brick with ribs produced by hand carving or by cutting out mere channels or by any method which is not, in substantial effect, the simultaneous creation of the plane surface and the ribs thereon by a cutting edge which sweeps through the body of the clay. Just where the dividing line might be between that which thus infringes and that which would not, is not involved, and perhaps the question will never arise.

The defendants' product is the result of a two-step wire-cutting process; plaintiff's patent describes a one-step process for making his product; and it is said that for this reason infringement is avoided. We cannot find, either in the specification or claim or in the Patent Office action or in the history of the art, any reason for limiting the patent in accordance with this theory. We are convinced that to do so would not only be to disregard the basis of the existence of product patents as a class by themselves, but also would be to reissue this patent with the very claim which was rejected by the Patent Office and discarded by the applicant. The cases cited in support of restricting the patent to the one-step process are Plummer v. Sargent, 120 U. S. 442, 448, 449, 7 Sup. Ct. 640, 642 (30 L. Ed. 737); Royer v. Coupe, 146 U. S. 524, 530, 531, 13 Sup. Ct. 166, 168, 169 (36 L. Ed. 1073); U. S. Glass Co. v. Atlas Glass Co. [C. C. A. 3] 90 Fed. 724, 33 C. C. A. 254.

In our judgment, these cases do not support the argument. In the Plummer Case, the patent was for a process of lacquering or japanning, consisting, according to the claim, of "the application of oil and heat, substantially as described." In order to sustain this patent against the defense of anticipation, it was necessary to limit the process rather closely to the succession of particular steps described in the specification, and it was held that, when the patent was so limited, defendant's process was not equivalent. In the Royer Case there was also a patent for a process which was claimed as a "treatment of the prepared rawhide in the manner and for the purposes set forth." It was held that the process, in its broadest aspect, was old; that "the only subject-matter of invention which the plaintiff could properly claim was the whole process described in his patent, comprising the different steps therein set forth"; and that, "in that view, it must be shown that the defendant used all the different steps of that process, or there could be no infringement." Obviously, if the patentee's finished hide had

been identified by some physical characteristics, and he had claimed an article of manufacture thus identified, there would have been a different question. In the Glass Co. Case it appeared that the process patented was confined by the claim to a succession of specific steps, and that the defendant omitted two of these steps. The conclusion was inevitable that "identity of method cannot exist."

[6] It is also suggested that the device of the patent in suit, if it had been later than the patent issued to Nicholson, would not have infringed that patent, and, hence, that defendants' device does not infringe plaintiff's patent. Electric Co. v. Pittsburgh Co., 125 Fed. 926, 60 C. C. A. 636, is cited to support this transposition and modification of the familiar rule—"that which, if later, would infringe, will anticipate, if earlier." The case seems hardly to support the citation; the language used by Judge Coxe (125 Fed. 930, 60 C. C. A. 636) is only a method of saying that the two things were wholly foreign to each other. If we could lay out of view the fact that plaintiff's patent is for a product and Nicholson's later patent is for a machine, it would still be true that anticipation depends upon the nature and extent of the earlier disclosure while infringement depends upon the character of the grant as fixed by the claim. The later patent is necessarily relatively specific as compared to an earlier invention; and a finding whether the earlier device, if later, would have infringed the later patent, is not helpful in determining whether the device of the later patent infringes the earlier one. The two questions have no necessary relation to each other. We have had occasion to point out that in this situation equivalency is not mutual. General Co. v. Electric Co., 243 Fed. 188, 193, 1007, 156 C. C. A. 54, 664; Curry v. Union Co., 230 Fed. 422, 429, 144 C. C. A. 564.

Nor does the fact that Nicholson uses his hands, in transferring his brick from the first wire-cutting device to the second, control the question of infringement. It is true that in Brown v. Davis, 116 U. S. 237, 249, 6 Sup. Ct. 379, 29 L. Ed. 659, the use of the human hand is relied upon as demonstrating noninfringement; but in that case one of the elements of the claim sued upon was a peculiar lever, and defendant dispensed with the lever and used his hand. This was the common case of omission of one of the elements of the claim.

There should be the usual injunction and accounting as to defendants' brick produced in the manner which we have described, and to permit the entry of such decree below, the existing decree should be set aside.

### On Motion to Reopen.

PER CURIAM. [7] By opinion filed January 7, 1919, we sustained the patent in suit and directed the usual interlocutory decree. The defendants now present three German patents which are said to anticipate, and ask leave to apply to the court below to reopen the case and put these into the record. The showing to excuse the failure to find this evidence in due time is not satisfactory. It is not clear that, in the search made in preparation for the answer, any effort was made to examine foreign patents. A generally similar showing could be

made in every case where there is a later discovery, and, if none but the parties were concerned, we should hesitate to grant the motion. Westinghouse Co. v. Stanley Co. (C. C. A. 1) 138 Fed. 823, 71 C. C. A. 189; Kissinger Co. v. Bradford Co. (C. C. A. 6) 123 Fed. 91, 59 C. C. A. 221; Novelty Co. v. Buser (C. C. A. 6) 158 Fed. 83, 85 C. C. A. 413, 14 Ann. Cas. 192.

However, others than the parties are interested. At least one of the German patents is superficially pertinent enough so that the validity of the patent in suit would be likely to be litigated over again by the next alleged infringer, both in the trial and appellate courts. In the meantime, the public would be uncertain whether the industry was or was not subject to this burden. In the interest of the public concerned with the patent, and in the interest of the courts, we think the proposed evidence should be brought into this record (Firestone Co. v. Seiberling [C. C. A. 6] 245 Fed. 937, 158 C. C. A. 225); but the plaintiff ought not to suffer damage from what is not its fault. It will be put to the additional expense of another trial in the District Court and perhaps another appeal, and a great part of this will be duplication which could have been avoided if the original defense had been more thorough. As a condition of allowing the belated defense to be now made, the defendants should meet this additional expense. The amount thereof is affected by so many uncertainties that it must be somewhat arbitrarily fixed. We apparently have the same opportunity as the trial court would have to make a reasonable estimate. We think $300 is certainly not too much to make the plaintiff good against the greater expense and delay which will result if the case is reopened and reheard upon the modified record, than there would have been if the entire defense had been originally presented.

The order will be that the District Court have leave to reopen the case and admit the proposed evidence and such further proofs as may be offered by either party in relation thereto and thereupon again determine the issue in the case upon the record as thus supplemented—all upon condition that the defendant pay to plaintiff, within such time as the court below may fix, the sum of three hundred dollars.