KELLOGG TOASTED CORN FLAKE CO. v. QUAKER OATS CO.

(Circuit Court of Appeals, Sixth Circuit.   October 3, 1916.)

No. 2807.

1. TRADE-MARKS AND TRADE-NAMES ☞3(4)—DESCRIPTIVE TERMS—"TOAST."

The expression "Toasted Corn Flakes," as applied to thin flakes of white corn browned by the heat, is a descriptive term not the subject of a trade-mark, for the word "toast" means to brown by the heat, which as to the flakes was accomplished by large ovens, and, though the word "flake" has other equivalents, the phrase used accurately describes the product.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 7;  Dec. Dig. ☞3(4).]

2. TRADE-MARKS AND TRADE-NAMES ☞3(3)—SUBJECTS OF TRADE-MARKS.

A descriptive term which does not indicate the origin of an article is not the subject of a technical trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 6;  Dec. Dig. ☞3(3).]

3. TRADE-MARKS AND TRADE-NAMES ☞73(1)—DESCRIPTIVE TERMS—SECONDARY MEANING.

A manufacturer or trader who has so used descriptive words with respect to his goods as to establish in the public mind a secondary meaning in the term as denoting his goods is entitled to protection when another attempts to dispose of his goods under such name, so as to pass them off as the goods of the first appropriator.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 84;  Dec. Dig. ☞73(1).]

4. TRADE-MARKS AND TRADE-NAMES ☞78—UNFAIR COMPETITION—RIGHT OF PROTECTION.

Where a manufacturer establishes in a descriptive word a secondary meaning as indicating his goods, he is entitled as against another only to such protection as will prevent such other from using that term to pass off his goods as those of the original appropriator.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 88;  Dec. Dig. ☞78.]

5. TRADE-MARKS AND TRADE-NAMES ☞93(1)—UNFAIR COMPETITION—PRESUMPTIONS.

While in the case of a technical trade-mark use by others is presumed to be with wrongful intent and will be enjoined, the rule is otherwise as to a descriptive word which it is claimed has acquired a secondary meaning as a trade-mark, and in such case the person asserting the secondary meaning has the burden of proving that his competitor's use of the term is unfair.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 104½;  Dec. Dig. ☞93(1).]

6. TRADE-MARKS AND TRADE-NAMES ☞93(3)—UNFAIR COMPETITION—SECONDARY MEANING OF TERM—EVIDENCE.

Where complainant claimed that the expression "Toasted Corn Flakes" had an acquired secondary meaning as indicating its product, evidence that persons engaged by complainant to call for such product at retail stores in the majority of instances received complainant's product is of little weight in establishing the secondary meaning of the term.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 106;  Dec. Dig. ☞93(3).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. TRADE-MARKS AND TRADE-NAMES ⬅️93(3)—UNFAIR COMPETITION—SECOND-ARY TRADE-MARK.

In a suit by complainant to enjoin another company from selling corn products under the name of "Toasted Corn Flakes," evidence *held* insufficient to show that the descriptive phrase "Toasted Corn Flakes" had generally acquired a secondary meaning indicating complainant's product so as to become a trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 106; Dec. Dig. ⬅️93(3).]

8. TRADE-MARKS AND TRADE-NAMES ⬅️73(1)—UNFAIR COMPETITION.

Where complainant had not even established a secondary trade-mark in the phrase "Toasted Corn Flakes," although to some of the trade the expression was shown to indicate complainant's product, defendant, which sold its own product under the same name, is not guilty of unfair competition, where the dress of the two packages was so unlike that defendant's product could not be mistaken for that of complainant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 84; Dec. Dig. ⬅️73(1).]

9. TRADE-MARKS AND TRADE-NAMES ⬅️75—UNFAIR COMPETITION—WHAT CONSTITUTES.

Though defendant sold its product under the descriptive name previously adopted by complainant, yet where there was no fraud on the public, defendant's goods not being palmed off as those of complainant, there was no unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. ⬅️75.]

10. TRADE-MARKS AND TRADE-NAMES ⬅️93(3)—UNFAIR COMPETITION—ADVERTISING.

That complainant spent large sums in advertising its product and defendant's sales of its product under the same name increased, though it spent little in advertising, is no ground for a finding of unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 106; Dec. Dig. ⬅️93(3).]

11. TRADE-MARKS AND TRADE-NAMES ⬅️93(3)—UNFAIR COMPETITION—WHAT CONSTITUTES.

That complainant had previously manufactured a similar product under a different name and the identical product under a different name, both of which ventures were abandoned, does not establish defendant's unfairness in subsequently disposing of its cereal under the name "Toasted Corn Flakes," which was first used by complainant, to describe its own cereal of identical nature.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 106; Dec. Dig. ⬅️93(3).]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Bill by the Kellogg Toasted Corn Flake Company against the Quaker Oats Company. From a decree of dismissal, complainant appeals. Affirmed.

G. T. Buckingham, of Chicago, Ill., for appellant.

Frank F. Reed and Edward S. Rogers, both of Chicago, Ill., for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SATER, District Judge.

WARRINGTON, Circuit Judge. The appellant, Kellogg Toasted Corn Flake Company, a Michigan corporation, brought suit against

appellee, the Quaker Oats Company, a New Jersey corporation, called defendant herein, to enjoin defendant from selling a food product, made from white corn, in cartons bearing the words "Toasted Corn Flakes," from using cartons containing such a food product and bearing such words, and from selling the product in the particular cartons which defendant is using. The case was heard finally upon the original bill, filed September 17, 1910, and certain amendments thereto, filed August 3, 1912, and answer and proofs, and the bill as amended was in terms dismissed for want of equity. The case is pending here on appeal allowed in the court below, June 29, 1915. The grounds of dismissal are sufficiently shown by two of the assignments of error:

"(4) In finding and holding that the words 'Toasted Corn Flakes,' as applied to the articles in controversy, are a descriptive term and not susceptible of exclusive appropriation."

"(9) In finding and holding that the evidence in this case shows no effort on the part of defendant to obtain the business of complainant, except only the use of the name 'Toasted Corn Flakes,' and that such name is, in fact, under the evidence so distinguished that there is no probability of confusion or deception arising."

It is contended for appellant (1) that the words "Toasted Corn Flakes," as applied to appellant's food product, constitute a technical, though unregistered, trade-mark; and (2) that assuming, though not admitting, that the words were not susceptible of original and exclusive appropriation as a valid technical trade-mark, appellant has, nevertheless, by long prior and exclusive use of the words, "in connection with its novel invented article, caused the words in the public mind to acquire a secondary meaning, designating" its "particular product"; and that defendant has intentionally and unfairly invaded appellant's right, and so is guilty of unfair competition.

[1] The subjects of these issues, the products of the respective parties, are substantially alike and are made in substantially the same way. The basic ingredient of each is white corn grits—that is, as appellant's counsel say, "corn with the jacket and germ removed"—which are steamed in closed vessels, called cookers, and flavored, dried and rolled into flakes (each grit being reduced to a flake), and then subjected to the heat of an oven. Appellant claims, and has presented some testimony to show, that this process produces "baked," not "toasted," corn flakes; and thus that "toasted" is a fanciful rather than a descriptive term. The ovens, therefore, involve an important feature of the process. The ovens are large, though indifferently described. It is fairly to be gathered from the evidence that they are each approximately 30 feet long, 25 feet high and 9 feet wide; that each is equipped inside with a series of metal belts, called shelves, about 25 feet in length and 3 feet in width, which are disposed one above another and operated slowly by power, and, presumably, alternately in opposite directions, so as to conduct the flakes (which are fed into the oven upon the top shelf) along each shelf, the flakes falling successively within the control of an apron from the end of one shelf to that of another until they reach and pass over the lower one, where they are discharged from the oven and carried to a point outside and placed and sealed in cartons. The heat maintained in the ovens averages about 450 degrees,

Fahrenheit, and is generated at the bottoms of the ovens—in the appellant's by a furnace, and in the defendant's by gas. The flakes passing through appellant's oven are not exposed directly to the fire of the furnace, but when the flakes carried through defendant's oven reach the bottom belt they are to some extent exposed to the gas flames, since defendant's shelves are made of perforated metal. The time consumed in carrying flakes from the entrance to the exit of defendant's oven is about 20 minutes, and it is to be inferred, though it is not distinctly shown, that practically the same time is used in appellant's oven. The products of both parties are through this treatment more or less browned.

It cannot be doubted that the effect of this process is to toast the corn flakes. In the first place, in our view of the evidence, it is not open to appellant to claim that, as applied to its product, the word "toasted," when considered either alone or in combination with the words "corn flakes," is a fanciful or arbitrary word. The appellant and its predecessors have manufactured this product in this way and have described the product by these words ever since 1898. It will serve to clarify the subject by alluding to the different companies which have been organized by the Kelloggs, and to some advertising matter which has been given widespread circulation in placing the product upon the market. The first two companies so organized were named, respectively, the Battle Creek Sanitarium Company and the Sanitas Nut Food Company, and were owned and controlled by Dr. Kellogg and his brother, W. K. Kellogg; the first-named company being organized in 1897, and the latter in 1899, though this one would seem to have been a partnership association until 1903, when it was incorporated. The Sanitarium Company manufactured cereal products and also acted as selling agent for the Sanitas Company, selling for the latter, among other products, "Toasted Corn Flakes." This plan was continued until 1906, and in March of that year Dr. Kellogg sold the exclusive right to make and sell "Toasted Corn Flakes" to the Battle Creek Toasted Corn Flake Company, which was organized in February of that year; and in July, 1907, this sale was confirmed by the Sanitas Company. The Sanitas Company, however, continued to make other cereal products until at least 1912. The name of the Battle Creek Toasted Corn Flake Company was changed in May, 1907, to that of Toasted Corn Flake Company, and in May, 1909, the name was again changed to that of appellant, and, notwithstanding these changes in corporate name, W. K. Kellogg appears to have been the president of the company throughout, and to have signed the original bill. The features of advertising matter put out by these companies, including appellant, which for present purposes sufficiently illustrate the understanding of these companies and the persons controlling them that the process resulted in toasting the corn flakes, may be seen in the following:

"They are so nourishing and easily digested; so scientifically cooked and toasted." "Properly cooked, flaked and toasted." "The flakes are exceedingly light, thin, crisp and tender, toasted just enough." "Rolled into thin flakes and toasted at a very high temperature." "So delightfully and tastily toasted." "Light crisp flakes of toasted corn that melt in your mouth—rolled

into film flakes and then toasted to a tempting golden brown." "A good corn recipe: Select choicest White Indian corn; flake each kernel so that flakes are as thin as writing paper; place flakes in baking pans and toast slowly in oven." "Toasted corn flakes are scientifically cooked and then toasted to a delicate brown."

And in an advertisement bearing apparently a facsimile of the signature of the president of appellant this is found:

"There is a secret in preparing Kellogg's Toasted Corn Flakes—a secret of toasting, blending and flaking 'the sweetheart of the corn' that other foods have never been able to copy."

These interpretations of the process of producing this food derive emphasis from the fact that the same interpretations are found in the advertising matter put out in respect of the patented product and process which were embodied in patent No. 558,393, issued to Dr. Kellogg, April 14, 1896, for "a certain new and useful alimentary product and process of making the same," and assigned by the patentee to the partnership association doing business as the Sanitas Food Company. True, Judge Wanty held the patent invalid, and his decree dismissing the bill was affirmed by this court in Sanitas Nut Food Co. v. Voigt, 139 Fed. 551, 71 C. C. A. 535; true, also, as counsel for appellant say, the word "toasted" was not found in the specification or claims of that patent. It is, however, noteworthy that in commenting upon "granose flakes," as the food was there called, Judge Wanty said that:

"Bread crusts, toast, zwieback and shredded wheat biscuits are the same product, containing every element of granose flakes, and only differing from them in form and degree."

Another fact to be observed is that the patented process was in substance and effect the same as the present process, which we have already described. Still in their interpretation of the patented process appellant's predecessors considered it as involving "flaking and toasting," and in the recipe in part before set out, containing the statement "place flakes in baking pans and toast slowly in oven," it was stated by appellant over its former corporate name, Toasted Corn Flake Company, and as late as October, 1908:

"You won't be able to prepare corn in this way unless you buy our patented machinery and process, but you can buy Sanitas Toasted Corn Flakes at your grocers."

If it were necessary to add anything to the foregoing, we think it might be affirmed to be common knowledge that placing corn flakes such as these in an oven and subjecting them to the degree of heat and for the time before pointed out cannot but result in toasting the flakes. It certainly must be generally known that the object of toasting bread is both to extract the moisture and give the bread a brown color, and, further, that this may be done in an ordinary kitchen-stove oven. Moreover, this is shown by defendant, without denial, from named cook books. Bread may be toasted, it is true, before an open fire; and this is consistent with definitions found in dictionaries, say in the Century, where "toast," the noun, is defined to be: "Bread in slices superficially browned by the fire; a slice of bread so browned." Again, "toast," the verb, is there defined: "To brown by the heat of a

fire; as, to toast bread or bacon." But the intransitive verb "toast" is thus defined: "To brown with heat." It is safe to say that this latter definition is in harmony with common experience. It is in accord, too, with Webster's definition: "To dry and brown by the heat of a fire; as to toast bread."

It is to be observed further that appellant's counsel claim, though we fail to find anything in the record really supporting the claim, that the words "corn" and "flakes" are not descriptive as applied to the product in question. It is said, for instance, that "maize" or "cereal" is more apt than "corn" to describe the material of which the product is made; and that "film," "scale," "chip," or "wafer" is technically more accurate than "flake" to describe the form of the article. We are not impressed by this argument. It is, of course, true that there are many objects which are each known by two or more names and which may be intelligibly described by the use of one of those names. It would be difficult, however, to conceive of an article that would be more universally identified by a single name, especially in this country, than the basic ingredient of this product is by the name "corn"; in commerce it bears that name and is a commodity widely dealt in and readily and unmistakably recognized simply by the use of that name. It is true, also, that "flakes" has synonyms, but none has been suggested which is as apt to describe the ultimate form given to this product as "flakes." Indeed, appellant's product is corn, flaked and toasted; it is in truth "toasted corn flakes," and is described with accuracy by those words; in short, the words, apart from their separate descriptive qualities, collectively describe with precision the chief ingredient, its form and ultimate mode of treatment. See Computing Scale Co. v. Standard Computing Scale Co., 118 Fed. 965, 967, 55 C. C. A. 459 (C. C. A. 6), as to word "computing," and Horlick's Malted Milk Co. v. Summerskill, 85 L. J. Rep. (July, 1916) 338, 341.[1]

[2] It hardly is necessary to add that appellant and its predecessors could not rightfully appropriate the name "Toasted Corn Flakes" to their exclusive use as an original technical trade-mark. It is not claimed, and since the Kellogg patent has been adjudged void it could not with any show of reason be claimed, that appellant or its predecessors ever possessed the exclusive right to manufacture and sell such a product as this; and it is quite as futile to insist that words describing the product with exactness, as here, can be regarded as fanciful or arbitrary symbols designed to show the origin of the product. The very essence of a technical trade-mark is that it denotes the origin of the article, not its quality. The doctrine of technical trade-marks is

---

[1] The descriptive quality thus shown to be possessed by the words "Toasted Corn Flakes," as applied to appellant's product, clearly distinguishes the instant case from that of Hamilton Shoe Co. v. Wolf Brothers, 240 U. S. 251, 256, 257, 36 Sup. Ct. 269, 60 L. Ed. 629, where the words "The American Girl" were held to constitute a technical trade-mark by reason of the fact that, as applied to shoes, they are an arbitrary, and not a descriptive, name; a like distinction exists between the case of Dennison Mfg. Co. v. Thomas Mfg. Co. (C. C.) 94 Fed. 651, 653 (cited with apparent approval in the foregoing case), and the present, in that the words there in issue, "American Express," were held to be susceptible of exclusive appropriation as a trade-mark for the reason that, as applied to sealing wax, they are devoid of descriptive quality.

too well settled to justify an extended citation of the decisions which forbid the employment of essentially descriptive words to indicate the source of an article intended for sale in the market; and this for the manifest reason that the fact expressed by the primary meaning of such words is a fact which others are entitled to express by the same words for the same purpose. Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665, 673, 21 Sup. Ct. 270, 45 L. Ed. 365; Standard Paint Co. v. Trinidad Asph. Co., 220 U. S. 446, 453, 31 Sup. Ct. 456, 55 L. Ed. 536; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 463, 14 Sup. Ct. 151, 37 L. Ed. 1144; Cellular Clothing Co. v. Maxton & Murray (1899) A. C. 326, 333, 336, 339, 340; American Wash Board Co. v. Saginaw Mfg. Co., 103 Fed. 281, 282, 43 C. C. A. 233, 50 L. R. A. 609 (C. C. A. 6); Computing Scale Co. v. Standard Computing Scale Co., 118 Fed. at page 967, 52 C. C. A. 459; Newcomer & Lewis v. Scriven Co., 168 Fed. 621, 625, 94 C. C. A. 77; De Voe Snuff Co. v. Wolff, 206 Fed. 420, 423, 124 C. C. A. 302 (C. C. A. 6); Trinidad Asph. Mfg. Co. v. Standard Paint Co., 163 Fed. 977, 90 C. C. A. 195, affirmed in 220 U. S. 446, 31 Sup. Ct. 456, 55 L. Ed. 536; Marvel Co. v. Pearl, 133 Fed. 160, 162, 66 C. C. A. 226 (C. C. A. 2); Brennan v. Emery-Bird-Thayer Dry Goods Co., 108 Fed. 624, 627, 47 C. C. A. 532 (C. C. A. 8); William Wrigley, Jr., & Co. v. Grove Co., 183 Fed. 99, 101, 105 C. C. A. 391 (C. C. A. 2); Duplex Metals Co. v. Standard Underground Cable Co. (D. C.) 220 Fed. 989, 991.

[3, 4] We have now to consider the contention that the words "Toasted Corn Flakes" possess a secondary meaning in the public mind, which is designative of appellant's goods and the foundation for the charge of unfair competition. Where a person has so used descriptive words as in truth to establish in them such significance as this with respect to his goods, he is entitled to relief against a subsequent user who is employing the words in a way calculated to effect sales of the latter's goods as those of the former, since such acts constitute unfair and fraudulent competition. Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 674, 21 Sup. Ct. 270, 45 L. Ed. 365; Computing Scale Company v. Standard Computing Scale Co., 118 Fed. 967, 55 C. C. A. 459, and citations. The relief granted in such cases is adapted to the circumstances of each particular case, though such as effectively to prevent confusion and fraud in sales of the subsequent user's goods; as, for example, in Hall's Safe Co. v. Herring-Hall-Marvin Safe Co., 146 Fed. 37, 44, 74 C. C. A. 361 (C. C. A. 6); s. c. sub. nom. Herring's, etc., Safe Co. v. Hall's Safe Co., 208 U. S. 554, 560, 28 Sup. Ct. 350, 52 L. Ed. 616, decree below modified and affirmed; Dietz v. Horton Mfg. Co., 170 Fed. 865, 872, 96 C. C. A. 41 (C. C. A. 6); G. & C. Merriam v. Saalfield, 198 Fed. 369, 375, 378, 117 C. C. A. 245 (C. C. A. 6); Allegretti Chocolate Cream Co. v. Keller (C. C.) 85 Fed. 643, 644; Bates Mfg. Co. v. Bates Numbering Mach. Co. (C. C.) 172 Fed. 892, 898; and as the late Mr. Justice Lurton said, in announcing the opinion of this court in the Computing Scale Case, before cited (118 Fed. 967, 55 C. C. A. 461):

"But when the word is incapable of becoming a valid trade-mark, because descriptive or geographical, yet has by use come to stand for a particular

maker or vendor, its use by another in this secondary sense will be restrained as unfair and fraudulent competition, and its use in its primary or common sense confined in such a way as will prevent a probable deceit by enabling one maker or vendor to sell his article as the product of another."

[5] If the words in issue in the instant case constituted a technical trade-mark, use by others of the mark would be presumed to be made with wrongful intent and so would be enjoined. Saxlehner v. Siegel-Cooper Co., 179 U. S. 42, 43, 21 Sup. Ct. 16, 45 L. Ed. 77; De Voe Snuff Co. v. Wolff, 206 Fed. at page 424, 124 C. C. A. 302. This, however, is not the rule in respect of the use by others of descriptive words which have acquired such secondary significance as is here urged. Samson Cordage Works v. Puritan Cordage Mills, 211 Fed. 603, 608, 128 C. C. A. 203, L. R. A. 1915E, 1109 (C. C. A. 6). It is conceded that the burden of proof is upon the appellant to establish such secondary meaning; and this is a substantial burden, since the ultimate fact to be proved is fraud, that is, that defendant is using the words in their secondary, not simply their primary, sense, and with the result of passing off its goods as the goods of appellant. Thus, in the language of the Lord Chancellor, in Cellular Clothing Co. v. Maxton & Murray, before cited (1899) A. C. at page 336: .

" * * * Where you are dealing with a name which is properly descriptive of the article, the burden is very great to show that, by reason of your using that name descriptive of the article you are selling, you are affecting to sell the goods of somebody else. * * * It cannot be denied, therefore, under those circumstances, that it was for the appellants to establish, if they could, that an ordinary word in the English language, properly applicable to the subject-matter of the sale, was one which has so acquired a technical and secondary meaning, differing from its natural meaning, that it could be excluded from the use of every one else. That is the proposition the pursuers had to make out."

[6, 7] We assume, since there was evidence tending to show as before stated, that the predecessors of appellant were the first to employ the words in issue to describe a product similar to that made and sold by each of the parties to this suit. The manufacture of the product was begun, and the words "Toasted Corn Flakes," applied in 1898, and this continued without competition until 1906. Throughout this period and until the right to make and vend the product was transferred as stated to the Battle Creek Toasted Corn Flake Company in 1906, the cartons bore upon their face:

"Sanitas Toasted Corn Flakes, made by the Sanitas Nut Food Co., Ltd., sold by Battle Creek Sanitarium Co., Ltd., Battle Creek, Mich."

In 1906, and after the transfer had been made to appellant, then bearing the name Battle Creek Toasted Corn Flake Company, the language used on the face of the cartons was changed into this:

"Sanitas Toasted Corn Flakes. None genuine without this signature—W. K. Kellogg. Battle Creek Toasted Corn Flake Co., Battle Creek, Mich."

Appellant's counsel explain, without dispute, that the signature of W. K. Kellogg was added for the reason that a person named Blanke had put on the market an article and called it "Toasted Corn Flakes." The last-named form of the Battle Creek Company was continued until

its name was changed to Toasted Corn Flake Company, when the name of the signing company was accordingly changed, and at the top of the cartons "Kellogg's" was substituted for "Sanitas." The only alteration that has since been introduced upon the face of the cartons occurred when the present name of appellant was adopted, and then its name was substituted for that of the previously signing company. Furthermore, this plan of displaying names of the product and also names of the companies in charge of the business during these respective periods has uniformly been followed in the advertising matter, except only for a time prior to the organization of the appellant company in 1906, when some posters were placed in street cars and on billboards in "many towns," with the designation alone of "Toasted Corn Flakes," and, in 1903, certain pictorial matter bearing these words was used for magazine and newspaper advertising by the Sanitarium Company and the Sanitas Company, though without their names; in a comparative sense, these exceptions to the rule seem to have been negligible.

Another feature of the record is to be noted. In May, 1911, appellant caused 21 women each to call at from 15 to 25 retail grocery stores to purchase "Toasted Corn Flakes," without disclosing name of manufacturer, and ostensibly in their own behalf; these instructions were carried out in 8 cities located, respectively, in Ohio, Illinois, Iowa, Minnesota, and North Dakota. Nine of the women made their purchases in different stores in Chicago, four likewise in Minneapolis, two in Des Moines, and two in Duluth, and each of the rest in a different city. The result was to secure about 80 per cent. of Kellogg's toasted corn flakes, and the rest in other brands. It was developed in this testimony that aside from the Kellogg brand there were then 15 other brands of toasted corn flakes on the market, though it does not appear how long before May, 1911, the other brands were or how long since then they have been on sale. It is observable that each of these other brands bore a name, in one instance the initials "E. C.," immediately preceding the words "Toasted Corn Flakes," in the same way as appellant and its predecessors have used the names "Sanitas" and "Kellogg's" preceding those words. It is further to be noticed that these women made their purchases of dealers whose obvious interest in the sale of toasted corn flakes and their consequent knowledge of the subject could scarcely be accredited to the ordinary class of real customers; and hence such testimony lends little aid in support of the claim of secondary meaning urged here. It is conceivable that some of these dealers, and presumably the minority, were actually selling one or more of the other brands, in as great, if not greater, quantities, than the Kellogg brand; and certainly the minority did not regard the disputed words as signifying only the appellant's brand. It is, moreover, to be observed of the testimony of these women that they all in substance testified that they had no difficulty whatever in distinguishing the different brands of toasted corn flakes, as, for instance, the cartons of appellant from those of the defendant.

Now, what significance of present pertinence have the facts thus pointed out? From 1898 to 1906 the predecessors of appellant had a virtual monopoly of the food product in question and likewise of the

term "Sanitas Toasted Corn Flakes," and so, inclusively, of the words "Toasted Corn Flakes"; but this was only because during that period no one else was either making or dealing in the article. The employment of descriptive words under such a condition of trade as this, does not give to the words a secondary meaning denoting only the maker's product; evidence that such a meaning is so acquired is of slight value; this is for the reason that in such circumstances the words could not refer to any product except the single and particular one so monopolized; and, consequently, the occasion for associating the words with the maker of the product does not arise, as it must when two or more competitors are making and selling similar products. Lord Davey said, in Cellular Clothing Co. v. Maxton & Murray, supra (1899) A. C. at page 343:

"The other observation which occurs to me is this: That where a man produces or invents, if you please, a new article and attaches a descriptive name to it—a name which, as the article has not been produced before, has, of course, not been used in connection with the article—and secures for himself either the legal monopoly or a monopoly in fact of the sale of that article for a certain time, the evidence of persons who come forward and say that the name in question suggests to their minds and is associated by them with the plaintiff's goods alone is of a very slender character, for the simple reason that the plaintiff was the only maker of the goods during the time that his monopoly lasted, and therefore there was nothing to compare with it and anybody who wanted the goods had no shop to go to, or no merchant or manufacturer to resort to except the plaintiff."

This rule was recently followed in the Court of Appeal in Horlick's Malted Milk Co. v. Summerskill, supra (85 L. J. Rep. July, 1916, at page 340), when passing upon the effect of a long period (25 years), during which "Horlick's Malted Milk" had been sold in England without competition.

In the next place, we have seen that in 1906 the virtual monopoly came to an end when one Blanke began to use the words "Toasted Corn Flakes" in introducing his product; and that by reason of this use the script signature of W. K. Kellogg was placed on appellant's cartons and in some of its advertising matter. According to appellant's brief, one or two others shortly afterward began to apply the words "Toasted Corn Flakes" to their products. We have also seen that in 1907 "Sanitas" was removed from the cartons and advertising matter, and "Kellogg's" was placed in its stead, immediately preceding the words "Toasted Corn Flakes." The prominently distinguishing words which have been displayed on appellant's cartons and in its advertisements, ever since the virtual monopoly ceased, have been "Sanitas Toasted Corn Flakes" and "Kellogg's Toasted Corn Flakes"; and it is this last form with which we are most concerned in the solution of the instant case. This collocation of words, "Kellogg's Toasted Corn Flakes," cannot be overlooked when considering the asserted secondary meaning solely of the words "Toasted Corn Flakes." Appellant has not been content with placing its corporate name and address at the bottom of its cartons or in its advertising matter; it has also been persistent in conspicuously associating the name "Kellogg's" with the particular words in issue. The only explanation of this practice is found in argument, not in the evidence.

Counsel say that it was "to emphasize origin, and not to distinguish makers." This in effect concedes that the words "Toasted Corn Flakes" were not sufficient to identify origin. The natural inference to be deduced from such a practice is that there was a consciousness, indeed, a belief, on the part of those in control of appellant, that these words were not enough to point out origin—even with the full corporate name displayed at the bottom of the cartons. This is not met by the suggestion that "Sanitas" was used in the same relation during the period of virtual monopoly. It is quite consistent with the practice during that period to infer that the use so made of "Sanitas" was in anticipation of competition. Competition actually arose during the use of "Sanitas" and was in existence when that name was displaced by "Kellogg's." It is not claimed that the practice did not operate to invest these names with efficient distinguishing characteristics. It is manifestly too late now to sever "Kellogg's" from the words "Toasted Corn Flakes" and ascribe to these latter words alone a meaning in the public mind which has never been relied on by the appellant itself. Appellant's conduct seems to savor too much of an admission to justify such a severance. Further, the showing that certain grocers have understood "Toasted Corn Flakes" to mean appellant's product does not prove that the average customer intending to purchase toasted corn flakes has any such understanding; and, in view of the many brands of this product that appear to have been on the market, it is most difficult to see how the use of such purely descriptive words as these can signify to any considerable portion of the public that they relate alone to appellant's product.

[8, 9] It must nevertheless be conceded that the evidence adduced here tends to show that some dealers in toasted corn flakes understand those words alone to denote appellant's product; and we assume for the purposes of this decision that there are customers of such dealers who, when asking simply for toasted corn flakes, expect to be supplied with the product of appellant. Such facts as these would, in a proper case, call for relief, not of an absolute but of a qualified character, such as would prevent others from selling their similar products as those of appellant. As this court said, when speaking of the distinction between the primary and secondary meaning of a descriptive word used as a trade-mark, in G. & C. Merriam Co. v. Saalfield, supra (198 Fed. at page 373, 117 C. C. A. at page 249):

"The alleged trespassing defendant has the right to use the word, because in its primary sense or original sense the word is descriptive; but, owing to the fact that the word has come to mean, to a part of the public, something else, it follows that when the defendant approaches that same part of the public with the bare word, and with nothing else, applied to his goods, he deceives that part of the public, and hence he is required to accompany his use of the bare word with sufficient distinguishing marks normally to prevent the otherwise normally resulting fraud."

And again (198 Fed. 375, 117 C. C. A. 251, and citations):

"So it is wrong, in such a case, and when this 'secondary meaning' is once established, to start with the premise that defendant is entitled to use the word; prima facie, viewed from this point, he is not. The right, for the purposes of such a case, is primarily vested in the complainant. Defendant may

not use the word at all, unless he accompanies it with the explanation; he must neutralize an otherwise false impression; he must 'unmistakably inform' the public that the article is of his production."

And as to the charge of unfair competition, this court has definitely stated and supported the rule thus (Samson Cordage Works v. Puritan Cordage Works, supra [211 Fed. 608, 128 C. C. A. 203, L. R. A. 1915E, 1109, and citations]):

"The existence of a valid trade-mark is not essential to a right of action for unfair competition, * * * in which action the essence of the wrong consists in the palming off of the merchandise of one person for that of another. * * * Unless such palming off is shown, the action fails. * * * And so unfair competition cannot be predicated alone on the use of another's mark which is invalid as a trade-mark because not appropriable as such; that is to say, when not used in such way as to amount to a fraud upon the public."

In Standard Paint Co. v. Trinidad Asph. Co., supra (220 U. S. at page 461, 31 Sup. Ct. at page 460 [55 L. Ed. 536]), when considering the use of the word "Rubbero," and its asserted resemblance to the word "Ruberoid":

"To preclude its use because of such resemblance would be to give to the word 'Ruberoid' the full effect of a trade-mark, while denying its validity as such. It is true that the manufacturer of particular goods is entitled to protection of the reputation they have acquired against unfair dealing, whether there be a technical trade-mark or not, but the essence of such a wrong consists in the sale of the goods of one manufacturer or vendor for those of another."

See Goodyear Co. v. Goodyear Rubber Co., 128 U. S. 598, 604, 9 Sup. Ct. 166, 32 L. Ed. 535; American Wash Board Co. v. Saginaw Mfg. Co., supra (103 Fed. at page 284, 43 C. C. A. 233, 50 L. R. A. 609); Apollo Bros. v. Perkins, 207 Fed. 530, 533, 125 C. C. A. 192 (C. C. A. 3); Rushmore v. Manhattan Screw & Stamping Works, 163 Fed. 939, 941, 90 C. C. A. 299, 19 L. R. A. (N. S.) 269 (C. C. A. 2).

Appellant is therefore not entitled to relief unless it appears that defendant fails clearly and effectively to distinguish the product it places on the market from appellant's product; and such failure is not shown. It can serve no useful purpose to describe in detail either the carton or the advertising matter employed by defendant to place its product on the market. There is no evidence tending to show that defendant either through dress or lettering imitates the carton or advertising of appellant. It is true that there is some resemblance in surface coloring between the two sets of cartons, but their appearance as a whole is strikingly different. There is no language, apart from the words "Toasted Corn Flakes," on defendant's carton that is at all like the language of appellant's carton. The pictorial parts are totally unlike and differently located. Where appellant uses "Kellogg's" in association with the words in dispute, defendant uses "Quaker," and the associated words are given more prominence on appellant's than on defendant's carton. Appellant's own witnesses testified that the cartons are readily distinguishable.

[10] Appellant shows that it expends vast sums in advertising its product, while defendant expends comparatively small sums for that

purpose, and yet that the sales of the latter have materially increased. It is argued from this that defendant is profiting from the demand created through appellant's large expenditures. The inference thus drawn, and it is only an inference, certainly derives no support from any suggestion ever made by appellant that defendant is even a producer of the article; and the inference is subject to a severe, if not a fatal, strain when it is considered that its effect would be to prevent another from honestly producing and selling his article unless he were prepared and willing to expend money in exploiting his product equally with his competitor. At most, then, whatever advantage defendant may derive through appellant's advertising expenditures, the advantage cannot rightfully be said to have been received through any act of fraud or unfair trade; and hence the inference might, for the sake of argument, be conceded, and still such an advantage would have to be treated purely as an incident to defendant's rightful pursuit of a lawful business, and as an advantage voluntarily bestowed by appellant.

[11] It is true, as appellant says, that in 1907 defendant began to manufacture toasted corn flakes from white corn and to call the product "Maz-All"; and, after giving up that enterprise, it commenced in 1909 to make the same product with yellow corn instead of white corn, and to call that product "Yello." It is not claimed that either of these names ever impinged in any way upon the rights of appellant. But it is insisted that these facts show that defendant's resumption of the manufacture of toasted corn flakes from white corn, and its use of the name "Quaker Toasted Corn Flakes," admittedly with notice of appellant's business and claimed trade-name, show an intentional invasion of appellant's rights as well as a substantial impairment of its good will. The answer to this is manifold: The insistence is not sustained by the evidence; the defendant has a legal right to manufacture toasted corn flakes from white corn, as well as yellow corn; and the manner in which it conducts its business is not calculated to deceive the public as to the origin of its product. No decision has come to our attention, which under the present showing would sanction judicial restraint upon defendant's method of conducting its business.

The decree is accordingly affirmed, with costs.