## COLONIAL RADIO CORPORATION v. COLONIAL TELEVISION CORPORATION.

District Court, S. D. New York.
June 8, 1948.

Clyde A. Norton, of New York City (Stephen H. Philbin, of New York City, of counsel), for plaintiff.

Joseph L. Greenberg, of New York City, for defendant.

LEIBELL, District Judge.

Plaintiff, Colonial Radio Corporation, commenced this action on February

13, 1948, against the defendant, Colonial Television Corporation, for an injunction restraining the defendant from infringing plaintiff's trademark and from engaging in unfair competition with the plaintiff; requiring the defendant to deliver up for destruction, labels, ·nameplates, stationery, advertising matter, etc. bearing the name "Colonial", Colonial Television Corporation or any colorable imitation thereof; and for an accounting of profits realized from the alleged infringement and unfair competition. Jurisdiction of this Court of the claim for trademark infringement is founded on Public Law 489 of the 79th Congress, known as the Lanham Act, 15 U.S.C.A. § 1121, "with pendent jurisdiction as to the claim of unfair competition". Best & Co., Inc., v. Miller, 2 Cir., 1948, 167 F.2d 374, 375.

The defendant, by its answer served March 5, 1948, asserts that the plaintiff abandoned its trademark and sets forth a counterclaim praying for an injunction, alleging:

"Seventh: That plaintiff has advised defendant that it intends to engage in the manufacture and sale to the general public of television receiving sets under the name of 'Colonial'; that such sale by the plaintiff will appropriate to the plaintiff the good will, good reputation and prestige now enjoyed by the defendant, and will cause confusion in the television field, inimicable to the defendant and to its detriment, and destroy the business of the defendant corporation, since the plaintiff has large financial means and will be able to influence dealers and advertising mediums by the use thereof, and thus cause the defendant irreparable damage.

"Eighth. That the use by the plaintiff of the word 'Colonial' in the manufacture of television sets, either as a trade mark or as its trade name, will cause confusion in the television trade, and will constitute an unfair competition with injury to the defendant, and that unless this court restrains the plaintiff, such conduct on the part of the plaintiff will cause irreparable injury to the defendant, for which the defendant has no adequate remedy at law."

Plaintiff's reply filed March 28, 1948, denies the material allegations of the defendant's counterclaim and alleges that plaintiff had started engineering, technical and development work in the television field prior to the formation of defendant corporation and expects to sell television receivers in the near future and has orders for them from Sears, Roebuck & Co.

On April 9, 1948 plaintiff moved this Court for an injunction pendente lite in accordance with the prayer of the bill of complaint. On the same day the defendant moved for summary judgment and for a preliminary injunction in accordance with the prayer of its counterclaim. I have concluded that plaintiff's motion should be granted and that defendant's motion should be denied.

I find that:

Colonial Radio Corporation was organized in 1924 under the laws of the State of Delaware and subsequently in 1929, a successor corporation, Colonial Radio Corporation, was organized under the laws of the State of New York and acquired all the assets and good will of the Delaware corporation which was dissolved on December 19, 1929. On June 2, 1925 the plaintiff's predecessor registered the name "Colonial", Registration No. 199,028, and "Colonial" with tree design (a pine tree symbol within a circle) Registration No. 199,029, for radio receiving apparatus and parts thereof, in Class 21, electrical apparatus, machines and supplies. These trademarks were renewed by the plaintiff prior to June 2, 1945.

From the time of its organization in 1924 the plaintiff engaged in the manufacture of radio receiving sets which it marketed under the name "Colonial", bearing the pine tree symbol trademark. From 1924 to 1936 its sales of such radios amounted to the sum of $13,478,039.81. During this period it obtained a contract in 1931 to manufacture and sell radios to Sears, Roebuck & Company which the latter would retail to the public under its own brand name, the name or trademark of Colonial Radio Corporation appearing nowhere on such sets. In 1935 the plaintiff began manufacturing and selling to the general trade and automobile manufacturers radios on the same basis as its sales to Sears, Roebuck, i. e. such sets were re-

tailed to the public by such purchasers under their own brand name. In 1937 the amount of these private brand sales and contracts therefor became so large in relation to the plaintiff's production capacity that Colonial Radio Corporation discontinued the manufacture and sale of radios bearing its trademark "Colonial" and the pine tree symbol over the name "Colonial".

From 1931, when it first began manufacturing "Private Brand" radio sets for Sears, Roebuck & Co. to 1946 when it was manufacturing these private brand sets for Sears, Roebuck, numerous automobile manufacturers, and other "private brand" sellers, the plaintiff's sales of such sets amounted to $75,840,849.68. During this same period it manufactured and sold radio receiving sets bearing the name "Colonial", or the trademark symbol of the pine tree over the name Colonial, in the amount of $147,722,169.47 except in 1937, 1938, 1939, 1940 and 1946 when no sales were made as Colonial "brand" radios; all the sales for those years were so-called "private brand" sales. This total sales figure, $147,722,169.-47 of Colonial radios, consists of $2,825,-160.51 of sales of Colonial brand radios to the general public during the years 1931 to 1936, and $144,897,008.96 sales of radios under Colonial name to the Armed Forces for military purposes during the years 1941 to 1945, under primary or sub-contracts. In 1946 plaintiff made and sold slightly over $13,000,000 of equipment for Sears, Roebuck and automobile companies as private brand merchandise.

In addition to the sales of merchandise bearing the "Colonial" name the plaintiff packed with each automobile radio it sold to Chrysler, DeSoto, Dodge and Plymouth automobile companies a "warranty material" tag which remained attached to the radio when the automobile was sold by the dealer to the consumer. This tag was first attached on June 14, 1946 and on the reverse side thereof, containing the warranties, it bears the name "Colonial Radio Corporation, 354 Rano St., Buffalo, N. Y." Subsequently a new warranty tag was adopted and is presently in use which does not contain the name "Colonial Radio Corporation" but does use the term "Authorized Colonial Warranty Service Station".

In connection with the servicing and warranty policy for these automobile radios the plaintiff selected some 1500 radio repair shops and dealers throughout the country as "service and repair stations" for the radios to which the aforementioned warranties applied. To these stations and to some 20,000 automobile dealers it supplied a radio service manual in which the name "Colonial Radio Corporation" and the pine tree symbol trademark prominently appears. The foreword of the manual states as follows:

"This Technical Auto Radio Service Manual is provided for the exclusive use of Colonial Radio Corporation Authorized Parts Distributors and Service Stations."

In the warranty section of the manual the following phrases appear:

"Chrysler-Colonial Warranty Policy Chrysler-Colonial 'Mopar' Auto Radio Receivers.

\* \* \* \* \* \*

"The Colonial Radio Corporation warrants each new radio receiving set \* \* \*.

\* \* \* \* \* \*

"In order to obtain Warranty Service on Colonial built Chrysler 'Mopar' receivers \* \* \*".

Plaintiff and its predecessor had widely and extensively advertised its radio products in connection with its trademark and corporate name at a cost of over $1,140,000 in the period 1924 to 1937 inclusive.

The plaintiff's activity in the field of television, as set forth in an affidavit of Henry C. Forbes, its Vice-President in charge of Engineering, is as follows:

"Colonial Radio Corporation has, for the past two years, been engaged in the development and design of television receivers, has built, operated and field tested models, and commenced a full sale [sic] production program. Plaintiff now has on its books orders for four thousand such receivers for delivery beginning in August, 1948."

The defendant, Colonial Television Corporation, was organized under the laws of the State of New York in or about January 1947 and became engaged in the manufacture and sale of a television receiving set which it produced under a license granted to it by the Radio Corporation of

America. The selection of the name "Colonial" by the defendant may have been an innocent selection free of any intent to purposely adopt the plaintiff's name and its concomitant benefits, if any. Defendant's incorporators consulted the Secretary of State of New York in order to determine the availability of the name Colonial Television Corporation and they were advised that it was presently available. If defendant's incorporators or their attorney had inquired in the Patent Office or among radio manufacturers, or at any auto radio service place, they would have learned of the plaintiff corporation. The letter of the New York Secretary of State as to the availability of the name defendant selected does not excuse defendant. Material Men's Mercantile Ass'n v. New York Material Men's Mercantile Ass'n, 169 App.Div. 843, 155 N.Y.S. 706, affirmed 224 N.Y. 670, 121 N.E. 878.

The defendant produced a television receiving set of a table model type, selling for $219.00, designed and suitable for use by the general public. It does not appear how long the defendant was engaged in the manufacture of this set but at least within a year it abandoned production thereof and commenced manufacturing a projection type television receiver which would project the picture on a screen of 3 square feet to 120 square feet in size. This set sells for about $2,200.00 and is designed for use by commercial and institutional users such as clubs, assembly halls, hospitals, theatres and large restaurants rather than for general public or home use. As stated in the affidavit of Ira R. Becker, Vice-President of Colonial Television Corporation:

"This set is not practical for home use, but is rather for institutional use, since the television set reproduces the televised objects in a size from three feet square to one hundred and twenty square feet. It is a costly and expensive instrument, and would therefore not find a sufficient market for home use.

"The sale of this product must be made direct by the defendant corporation or by dealers who are specifically licensed by the defendant to handle the sale of the instrument in specified territories where commercial adaptation of the instrument is available in large quantities. The instrument would not be sold in a retail store which sells radios or television sets for home use, since the present market for radio sets is scaled from $8.25 per set up."

After the defendant became incorporated and began the manufacture of television receiving sets, various notices concerning their product appeared in the trade journals. In Radio & Appliance Journal, May 1947, an article under the title "Colonial Vision Master" appears in which reference is made to "Colonial Television of Laurelton, L. I." and later in the same article to "Colonial". On the same page an article appears dealing with frequency modulation radio receivers. In another journal, Radio and Television Weekly, November 19, 1947, an article under the title "Colonial Television in Larger Capacity Plant" refers to "The Colonial Television Corp., New York" and to "Colonial". In Retailing Home Furnishings, January 26, 1948, an article under the subject "Radios and Television" refers to defendant's product as "Colonial Radio Corp.'s theatre-size television receiver".

Various exhibits attached to the affidavits of William O. Bruyere, plaintiff's assistant Service Manager, Richard K. Pew, plaintiff's Service Manager and H. Howard Babcok, an attorney, indicate that the plaintiff, Colonial Radio Corporation received several items of correspondence from department stores and others inquiring about the "Colonial Vision Master" television set manufactured by the defendant, and about the projection type television set manufactured by the defendant. All these inquiries assumed that the manufacturer of the set was the plaintiff, Colonial Radio Corporation, and one letter refers to Colonial Television Corporation, the defendant, as a subsidiary of plaintiff corporation. Another letter dated February 11, 1948, is from Marshall Field & Co., New York, addressed to Colonial Television Corporation at Buffalo, N. Y., inquiring about the Colonial "Vision Master" for its stores in Chicago and Seattle. Another is from the Society of Motion Picture Engineers, dated February 18. 1948, and addressed to Colonial Radio Corporation, requesting a demonstration of television equipment and stating:

"Since the demonstration of Mr. Bert D'Orsay of large screen television at the Shrine Auditorium in Los Angeles on New Year's day, much interest has been engendered locally in equipment manufactured by your company."

No such demonstration was conducted by the plaintiff corporation.

A letter from the Middlesex Supply Corp., Lowell, Massachusetts, dated February 19, 1948, addressed to Colonial Radio Corporation, stated they were "very much interested in your 'Vision Master' Theatre size Television system".

The Goldmann Department Store, Milwaukee, Wis., on March 6, 1948 wrote "Colonial Radio Manufacturing Corporation" at Buffalo, N. Y., as follows:

"We have seen the Colonial television set in Chicago and I am wondering whether you have any sort of an exclusive franchise for Milwaukee, for we operate three stores in addition to the above leased department".

Thus we have specific instances of deception and confusion, and the likelihood that they will greatly increase as plaintiff commercially enters the television field.

About July 1947 plaintiff endeavored to persuade defendant to respect plaintiff's rights without the necessity of litigation but was unsuccessful.

### Discussion

In its complaint the plaintiff has asked for an injunction, an accounting and other relief for the alleged trademark infringement. On its present motion the only question is whether it is entitled to a preliminary injunction.

The plaintiff has a clear legal right to the protection of a valid trademark and its trade name, and against conduct of the defendant constituting unfair competition. The affidavits and exhibits submitted present the facts as completely as they may be adduced upon a trial of the issues and I believe that the plaintiff will succeed on the trial of this action.

■ The plaintiff has a valid trademark, the name "Colonial" having been arbitrarily selected and free of any geographical or descriptive qualities. As the owner of such a trademark it is entitled to injunctive protection against any use or imitation of it. Hamilton-Brown Shoe Co. v. Wolf, 1916, 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 1916, 235 F. 657, 664. And this protection is not limited to the product of the plaintiff but extends to merchandise of substantially the same descriptive properties. Standard Brands, Inc., v. Smidler, 2 Cir., 1945, 151 F.2d 34. The rule has been extended to the protection of the reputation of a business against the use of its name by others even "upon noncompeting goods, if the defendant's goods are likely to be thought to originate with the plaintiff". Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969, 972, citing cases in support of that principle. Plaintiff has arbitrarily selected a name which has acquired a secondary meaning in the radio field, which extends into the field of television, and defendant's entry into the television field with a similar name has already caused confusion.

■ In Standard Brands, Inc., v. Smidler, supra, the Court said [151 F.2d 37]:

"The protection which the law gives the owner of a trade-mark is not confined to the goods upon which it is, or has been, used by the owner of it but extends to products which would be reasonably thought by the buying public to come from the same source if sold under the same mark. * * * This mark is the brand by which his goods can be identified, and when it is used by another the reputation of his mark, and consequently his own business reputation, are placed to that extent beyond his control. Unless the use by that other is upon goods so unlike his own or in territory so far from that which he has exploited that it will not create confusion, it will be enjoined. * * *"

While the defendant argues that the parties are not engaged in the manufacture of competitive articles and that the fields of television and radio are separate and distinct it is apparent that the manufacture of a television set is not so far removed from or so unlike the manufacture of radio receiving sets as to exclude it from the rule of possible extension of the first users busi-

ness into the new field. Both are within the field of electronics. Both employ radio waves, one for sound only and the other for sound and vision, as described in the affidavit of Henry C. Forbes, plaintiff's Vice-President in charge of engineering. Both are manufactured of similar materials and encased in cabinets in a similar manner, in some cases both are encased in the same cabinet. Both are used by the public to receive scheduled programs for amusement, appreciation, education, interest and other purposes in the same manner. Both are usually sold by the same retailers and are treated as related fields in the trade journals. Manufacturers, such as RCA, Crosley, Philco, Emerson and Motorola, make both radio and television sets.

In Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., 2 Cir., 1939, 105 F.2d 908, 909, the plaintiff had been engaged in the manufacture of electric motors but had never manufactured or sold radios over a period of thirty-three years. The defendant, using the same trade name, "Emerson" had been manufacturing radios and phonographs for twenty-three years before the plaintiff attempted to assert his rights in the trade name. In discussing the nature of the right asserted by the plaintiff the Court said:

"The doctrine upon which the plaintiff must rely is an outgrowth from the general principles of unfair competition. It depends upon two suppositious interests which the putative wrongdoer invades. One of these is, not in any sales of which he will deprive the plaintiff at the time, for the plaintiff is not selling any of the wares in question, but in those sales which the plaintiff will lose in case he chooses to extend his business into the market which the wrongdoer has begun to exploit. In the case at bar the defendants will not take away any customers from the plaintiff, unless the plaintiff begins to sell radios, and, so far as appears, it has no such purpose, for the present at least. The other interest is the plaintiff's general reputation which goes with his name. Buyers from the putative wrongdoer may also buy from the plaintiff, and may confuse the two; the plaintiff will not wish to expose his reputation to the chances of the wrongdoer's conduct of his business. * * * Courts

have not always thought these two interest—both, it will be observed, altogether future and contingent—substantial enough to justify their intervention. Borden Ice Cream Co. v. Borden's Condensed Milk Co., 7 Cir., 201 F. 510. However, more recently it has become settled that they may be; that is to say, if one merchant has established a business under his name in wares of one sort, a second merchant may not use that name in selling other wares, if these are so like the first merchant's that the public will be apt to think that the first merchant is selling them. We have so held a number of times. Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A.1918C, 1039; Anheuser-Busch v. Budweiser Malt Products Corp., 2 Cir., 295 F. 306; France Milling Co. v. Washburn-Crosby Co., 2 Cir., 7 F.2d 304; Yale Electric Corp. v. Robertson, 2 Cir. 26 F.2d 972; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272."

The manufacture and sale of television receiving sets is more closely related to the manufacture of radio receiving sets than are phonographs to radios. The product manufactured by the defendant is one which might reasonably be presumed to have been manufactured by the plaintiff, the name Colonial clearly being a use or adaptation of the same name or trademark owned by the plaintiff. This case falls within the "extension of use doctrine" set forth in the Emerson and Standard Brands cases.

It is unfair competition to appropriate and use in the manufacture and sale of an article a name which has been and is being used in the same general field by another. Kay Dunhill, Inc., v. Dunhill Fabrics, D.C., 44 F.Supp. 922; Moxie Co. v. Noxie Kola Co. of New York, D.C., 29 F. Supp. 167; Long's Hat Stores Corp. v. Long's Clothes, 224 App.Div. 497, 231 N.Y.S. 107. In the language of Judge Learned Hand in Lambert Pharmacal Co. v. Bolton Chemical Corp., D.C., 219 F. 325, 326, "In choosing an arbitrary trade-name, there was no reason whatever why they should have selected one which bore so much resemblance to the plaintiff's; and in such cases any possible doubt of the likelihood of damage should be resolved in favor of the plaintiff". That principle was quoted

·by Judge Leahy in Telechron, Inc., v. Telicon Corporation, D.C., 70 F.Supp. 439.

The defendant has not been in business for any length of time, having been organized in 1947, a year before the commencement of this action. The defendant has not built up any substantial business on the name "Colonial" within this short space of time and the plaintiff has not been remiss in asserting its rights and serving notice thereof upon the defendants.

■ The defendant's contention that plaintiff has abandoned its trademark is without merit. Its trademark, Registration No. 199,028, granted June 2, 1925 was renewed in June 1945. The plaintiff notified defendant of its infringement in July 1947 and brought this action with reasonable promptness after it failed to persuade defendant to cease infringing. Plaintiff's name "Colonial" is currently used on warranty cards attached to radios sold with Chrysler and General Motor's automobiles. From 1942 to 1945 its name was affixed to some $112,750,520.59 worth of radio equipment sold to the armed forces. It publishes a trade journal prominently featuring the name Colonial which is distributed to its personnel and to suppliers of the corporation. Abandonment is a question of intent. The fact that plaintiff found it more profitable to make private brand radios for the general trade and automobile receivers for the auto manufacturers, to the exclusion of its own Colonial brand radios for five or six years between 1937 and 1942 was not an abandonment of its trade mark. It maintained "Colonial Service" for the repair of the radios it manufactured for the automobiles and that part was publicized. In 1946 plaintiff's express warranty was attached to the receivers it sold auto manufacturers. Ever since its incorporation plaintiff has used its corporate name "Colonial" in all its dealings for a period of almost twenty-five years. It has never ceased to manufacture and sell radios during that period. Plaintiff's name and its trade mark (which are practically the same) are known to many thousands of persons. The facts adduced by the plaintiff constitute affirmative proof that it never had any intention of abandoning its trademark. In the absence of such intention there was no abandonment. Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; Du Pont Cellophane Co., Inc., v. Waxed Products Co., Inc., 2 Cir., 1936, 85 F.2d 75.

■ The defendant's second contention is that there is no competition between it and the plaintiff because the plaintiff does not sell to the general public but only to "private brand" purchasers, whereas the defendant does sell to the public. In view of the other facts hereinabove set forth that statement, if true, would not change the result. Further, the affidavit of the Vice-President of the defendant corporation, stating that the cost of defendant's present product (a television set with a moving picture projection which projects the television picture on a large theatre size separate screen) was prohibitive with respect to the general public for home use and that it was suitable for use only by institutions and other places where large audiences could be accommodated, shows that defendant's interest in the general public as consumer-purchasers is not a material one.

■ The right asserted by plaintiff, under the extension of use doctrine, is a contingent and future one, 1 Nims, Unfair Competition and Trade-Marks, § 374, and is not dependent on the element of present competition. Plaintiff has fully established that right and has also shown that its entrance into the television field was the subject of research by its engineers prior to the organization of the defendant and that plaintiff is manufacturing television sets for Sears, Roebuck for August delivery.

■ The right asserted by the plaintiff is, as between plaintiff and defendant, a substantial one. The question of whether the goods sold by defendant are in competition with plaintiff's goods, may have a bearing on the right of plaintiff to an accounting of defendant's profits, but plaintiff's right to an injunction does not depend on that. See Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969.

■ That confusion has already developed among dealers and others is amply shown by the plaintiff. The validity of plaintiff's trademark, plus the confusing use of the major part of it by defendant,

554

is sufficient to entitle plaintiff to relief. LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 1946, 157 F.2d 115; Magazine Publishers v. Ziff-Davis Pub. Co., 2 Cir., 1945, 147 F.2d 182. Those rights have not been curtailed by the Lanham Act, 15 U.S.C.A. 1051 et seq. but appear to have been broadened. See Best & Co. v. Miller, 2 Cir., 167 F.2d 374, dissenting opinion of Clark, J.

Under all the circumstances of this case, with respect to both the charge of trademark infringement and the claim of unfair competition, I believe the plaintiff has shown a clear right to relief, in the form of a preliminary injunction. In granting that relief I find no great damage or harm will be imposed upon the defendant, a comparatively new corporation. Defendant can easily change its name. The longer it waits the greater the hardship. It should have made the change when plaintiff first complained in July of 1947. The equities and the balancing of conveniences favor the plaintiff. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.

Plaintiff's motion for a preliminary injunction is granted on condition that plaintiff post a bond of $25,000 in the usual form pursuant to Rule 65(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Defendant's motion for summary judgment and for a preliminary injunction is denied.

The Court's findings of fact and conclusions of law "appear" in the above opinion as required by Rule 52(a) as amended.